**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4061**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

OCEANIC ILLSABE LIMITED,

Defendant – Appellant.

**No. 17-4062**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

OCEANFLEET SHIPPING LIMITED,

Defendant – Appellant.

Appeals from the United States District Court for the Eastern District of North Carolina, at Wilmington. Malcolm J. Howard, Senior District Judge. (7:15-cr-00108-H-3; 7:15-cr-00108-H-4)

Argued: December 7, 2017                    Decided: May 7, 2018

Before TRAXLER, KING, and HARRIS, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Traxler and Judge Harris joined.

---

**ARGUED**: George Michael Chalos, CHALOS & CO, P.C., Oyster Bay, New York, for Appellant. Emily Anne Polachek, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF**: Briton P. Sparkman, CHALOS & CO, P.C., Oyster Bay, New York, for Appellant. Jeffrey H. Wood, Acting Assistant Attorney General, Eric Grant, Deputy Assistant Attorney General, Allen M. Brabender, Kenneth E. Nelson, Brendan C. Selby, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; John Stuart Bruce, United States Attorney, Jennifer May-Parker, First Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina; Brendan T. Gavin, LCDR, Deputy Staff Judge Advocate, UNITED STATES COAST GUARD, Norfolk, Virginia, for Appellee.

---

KING, Circuit Judge:

In 2016, Oceanic Illsabe Limited ("Oceanic") and Oceanfleet Shipping Limited ("Oceanfleet") (together, the "Appellants") — two closely related corporate entities headquartered in Greece — were each convicted of nine criminal offenses by a jury in eastern North Carolina. Those crimes were directly committed by the supervisory personnel in the Engine Department of the M/V OCEAN HOPE (the "Ocean Hope," or the "Vessel") — an oceangoing cargo ship owned and operated by the Appellants. The offenses of conviction arose from and are related to illegal discharges of large quantities of oily pollutants from the Vessel into the ocean. Oceanic and Oceanfleet maintain on appeal that the prosecution failed to sufficiently prove that they are criminally responsible for the offenses lodged against them. The Appellants also contend that the district court erred in imposing fines and other penalties at sentencing. As explained below, we affirm the convictions and sentences.

I.

A.

We begin with a brief review of some pertinent legal and factual background for this prosecution. The United States is a signatory to the 1973 International Convention for the Prevention of Pollution from Ships, as amended in 1978 ("MARPOL"). MARPOL's primary purpose is to eliminate pollution of the oceans by discharges of oily wastes. To that end, MARPOL — an abbreviation for "marine pollution" — requires its

3

member states to punish under domestic law any violations of MARPOL that occur on oceangoing ships, and to provide for penalties that will discourage additional violations.

In compliance with MARPOL, our Congress enacted in 1980 the Act to Prevent Pollution from Ships ("APPS"). APPS provides that foreign ships in the navigable waters of the United States are subject to the discharge requirements of federal law pertaining to oily pollutants. *See* 33 U.S.C. § 1902(a)(2).[1] With respect to discharges of such pollutants that occur outside our navigable waters, the Coast Guard can assert jurisdiction when a foreign ship fails to make complete and accurate entries in the ship's Oil Record Book. *Id.* § 1908(a).[2]

MARPOL and federal law both require all oceangoing ships exceeding 400 gross tons to maintain an Oil Record Book. *See* 33 C.F.R. § 151.25(a). The Oil Record Book must be fully updated any time a ship's crewmembers engage in certain "machinery space operations," including the disposal of oily pollutants and wastes. *Id.* § 151.25(d).[3]

---

[1] For convenience, we refer to the oily waste products of oceangoing ships, such as bilge water and sludge, as "oily wastes," "oily mixtures," "oily pollutants," or simply as "pollutants."

[2] Section 1908(a) of Title 33 of the United States Code provides that "a person who knowingly violates [APPS], or the regulations issued thereunder commits a . . . felony."

[3] Pursuant to Section 151.25(h) of Title 33 of the Code of Federal Regulations, "[e]ach operation [mandated in section 151.25(d)] shall be fully recorded without delay in the Oil Record Book so that all the entries in the book appropriate to that operation are completed." Section 151.25(d) provides that

> [e]ntries shall be made in the Oil Record Book on each occasion, on a tank
> to tank basis if appropriate, whenever any of the following machinery space
(Continued)

4

Because oceangoing ships generate large quantities of oily pollutants and wastes, their Oil Record Books are required to be updated "without delay." *Id.* § 151.25(h).

The applicable regulations prescribe how to properly dispose of specific waste products, including bilge water and sludge. *See* 33 C.F.R. § 151.10(a). Bilge water is created when water accumulates at the bottom of a ship and combines with oily mixtures that have leaked and dripped from the engine fuel systems. *Id.* § 151.05. Bilge water must be collected and stored in tanks onboard the ship and then processed through two pollution control devices, the Oil Water Separator (the "Separator") and the Oil Content Monitor (the "Content Monitor"). *Id.* § 151.10(a)(5)-(6). If, after passing through the Separator, the Content Monitor measures only negligible quantities of oil, bilge water can be legally discharged into the ocean. *Id.* Sludge — that is, the oil residue left over after bilge water has been processed through the Separator — must either be incinerated onboard the vessel or offloaded in port to a licensed hauler and disposal facility. *See* MARPOL, Annex VI, Reg. 16.1. The foregoing disposal activities must always be assiduously recorded in the ship's Oil Record Book.

---

operations take place on any ship to which this section applies - (1) Ballasting or cleaning of fuel oil tanks; (2) Discharge of ballast containing an oily mixture or cleaning water from fuel oil tanks; (3) Disposal of oil residue; (4) Discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces; (5) Bunkering of fuel or bulk lubricating oil; and (6) Any failure, and the reasons for, of the oil filtering equipment.

*See* 33 C.F.R. § 151.25(d).

B.

On April 14, 2016, the grand jury in the Eastern District of North Carolina returned the operative nine-count indictment in this case and charged Oceanic, Oceanfleet, and two of the Ocean Hope's supervisory personnel (the "Indictment"). The indicted supervisory personnel were Chief Engineer Rustico Ignacio and Second Engineer Cassius Samson of the Engine Department. The charges against the defendants included conspiracy to commit offenses against the United States, failure to fully and accurately maintain (and aiding and abetting the failure to fully and accurately maintain) the Ocean Hope's Oil Record Book, a charge of obstruction of justice by falsification of (and aiding and abetting the falsification of) the Oil Record Book, making false statements to Coast Guard investigators, a second obstruction of justice charge for making false statements to Coast Guard investigators, and four charges of witness tampering. Samson was subjected to eight charges — all the counts alleged except Count Six — while Chief Ignacio was subjected to five charges — Counts One, Two, Three, Six and Nine. More specifically, the nine offenses alleged in the Indictment were as follows:

- Count One — Conspiracy to violate APPS and obstruct justice, in violation of 18 U.S.C. § 371;

- Count Two — Violating APPS by failing to fully and accurately maintain — and by aiding and abetting the failure to fully and accurately maintain — the Oil Record Book, in violation of 33 U.S.C. § 1908(a), 18 U.S.C. § 2, and 33 C.F.R. § 151.25 (the "Failure to Maintain charge");[4]

---

[4] Section 2 of Title 18, commonly referred to as the aiding and abetting statute, is actually titled "Principals," and provides that

(Continued)

6

- Count Three — Obstructing justice by falsification of — and by aiding and abetting the falsification of — the Ocean Hope's Oil Record Book, in violation of 18 U.S.C. §§ 1519 and 2 (the "Obstruction by Falsification charge");[5]

- Count Four — False statements to Coast Guard investigators, in violation of 18 U.S.C. § 1001(a)(2);

- Count Five — Obstructing justice by making false statements to Coast Guard investigators, in violation of 18 U.S.C. § 1505; and

- Counts Six through Nine — Four offenses of witness tampering, in violation of 18 U.S.C. § 1512(b)(3).

Oceanic and Oceanfleet were charged in each of the nine counts with being vicariously liable for the illegal activities of Chief Engineer Ignacio and Second Engineer Samson, who were acting within the scope of their agency and employment. At the conclusion of the pretrial proceedings, the four defendants — Oceanic, Oceanfleet, Chief Ignacio, and Samson — were jointly tried before a jury in Wilmington.

---

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

[5] When we refer herein to falsification of the Oil Record Book — as alleged for example in Count Three of the Indictment — such references include knowing concealment, covering up, making false entries, and omissions of required entries in the Oil Record Book.

C.

The trial lasted several days and concluded on September 1, 2016. The jury heard approximately twenty witnesses and was presented with numerous exhibits and records.[6] The witnesses confirmed that, sometime in April 2015, the Ocean Hope embarked on a voyage from Bangladesh in southern Asia to Wilmington in eastern North Carolina. During that trip, the Engine Department's subordinate crewmembers — at the direction of Chief Engineer Ignacio and Second Engineer Samson — ignored the waste disposal procedures required by MARPOL and APPS and illegally discharged large quantities of oily pollutants into the ocean. Several crewmembers confirmed that, after the Vessel's arrival in Wilmington, they were instructed by Chief Ignacio and Samson to make false statements to the Coast Guard investigators about the illegal discharges. The Oil Record Book of the Ocean Hope was not accurately maintained and was systematically falsified. The trial evidence proving those unlawful activities is summarized below.

1.

The jury learned that the Ocean Hope was owned by Oceanic, a Liberian corporation with its principal place of business in Greece. In October 2009, Oceanic contracted with its parent entity, Oceanfleet — a Marshall Islands corporation headquartered in Greece — to provide commercial ship management services to the Ocean Hope. Oceanic and Oceanfleet retained a staffing agency in the Philippines to

_____

[6] The facts recited herein are derived from the trial record and are presented in the light most favorable to the government, as the prevailing party. *See United States v. Singh*, 518 F.3d 236, 241 n.2 (4th Cir. 2008).

8

provide seafarers (i.e., employees) to operate and maintain the Ocean Hope. Several of those employees were the subordinate crewmembers in the Vessel's Engine Department, and worked under the supervision of Chief Engineer Ignacio and Second Engineer Samson.

The Engine Department was staffed by eight crewmembers. The crewmembers generally wore uniforms with the name "Oceanfleet" affixed thereon. The prosecution emphasized that the Department's crewmembers confirmed to the jury that they were employed by either Oceanic or Oceanfleet, or by both Appellants. For example, Second Engineer Samson confirmed that his salary came from both Oceanic and Oceanfleet. Samson said that the name "Oceanic Illsabe" was written on his employment contract, and that Oceanfleet operated the Ocean Hope for the duration of his employment. The subordinate crewmembers understood that they were employed by Oceanfleet.

All of the Engine Department crewmembers were required to comply with the Oceanfleet Safety Management System Manual (the "Oceanfleet Manual"), which had the name "Oceanfleet" emblazoned on nearly every page. The Oceanfleet Manual explained the chain of command on the Ocean Hope and emphasized that "orders are given and expected to be obeyed down the chain of command without hesitation or question." *See* G.A. 344.[7] At the apex of the Department's hierarchy was Chief

---

[7] Three separate appendixes have been filed in these appeals and are referred to herein. Our references to the "J.A. __" refer to the contents of the Joint Appendix. Our citations to the "G.A. __" refer to the contents of the Government's Supplemental Appendix, which was filed by the prosecutors. Finally, our references to the "S.A. __" (Continued)

9

Engineer Ignacio, followed by Second Engineer Samson. Chief Ignacio and Samson were responsible for managing the day-to-day operations of the Department. Further down the chain were third engineer Menente, fourth engineer Sarduma, two "oilers" named Villar and Villegas, a "fitter" named Belleza, and a "wiper" named Reyes.

In his supervisory capacity, Chief Engineer Ignacio was responsible for ensuring the Engine Department's compliance with all required safety and pollution control procedures. Pursuant to the Oceanfleet Manual, Chief Ignacio was also responsible for tracking the generation, transfer, and disposal of all oily pollutants produced onboard the Ocean Hope. Chief Ignacio was specifically required by the Oceanfleet Manual to fully and accurately record the completion of those tasks in the Vessel's Oil Record Book.[8]

2.

Evidence of the Ocean Hope's organizational structure provided the foundation for the government's theory of the vicarious criminal liability of the Appellants. The prosecution proved that the supervisory personnel in the Ocean Hope's Engine

---

refer to the contents of the Sealed Appendix, which contains the presentence reports (the "PSRs") for Oceanic and Oceanfleet which are sealed.

[8] Pursuant to MARPOL and APPS, maintenance of the Oil Record Book must be assigned to "[t]he master or other person having charge of [the] ship." *See* 33 C.F.R. § 151.25(j). Although the master of the ship (or other person in charge of the ship) is the person directly responsible for proper maintenance of the Oil Record Book, the Oceanfleet Manual purported to assign that duty to the Chief Engineer of the Ocean Hope, that is, Chief Engineer Ignacio. Notwithstanding the provisions of the Oceanfleet Manual, the Appellants had no authority to override the applicable legal principles or reassign to the Chief Engineer any responsibilities placed on the ship's master under federal law.

10

Department — that is, Chief Engineer Ignacio and Second Engineer Samson — oversaw and regularly directed illegal discharges of bilge water and sludge into the ocean. The prosecution also proved that Chief Ignacio and Samson committed the offense alleged in the Failure to Maintain charge by contravening the provisions of § 1908(a) of Title 33 and § 2 of Title 18, by aiding and abetting the failure to fully and accurately maintain the Ocean Hope's Oil Record Book. Similarly, the evidence proved that Chief Ignacio and Samson committed the Obstruction by Falsification charge, in violation of §§ 1519 and 2 of Title 18.[9] In addition, Chief Ignacio and Samson had corruptly persuaded their subordinate crewmembers in the Engine Department to make false statements to the Coast Guard investigators in Wilmington. Those false statements were made on behalf of the Appellants in a corrupt endeavor to conceal the pollution offenses that had occurred on the Ocean Hope.

a.

The evidence proved that illegal discharges of bilge water and sludge consistently occurred during the Vessel's trip to Wilmington. For example, Second Engineer Samson, with Chief Engineer Ignacio's approval, directed oiler Villegas to pump unprocessed bilge water directly into the ocean two to three times each week, using the Ocean Hope's

---

[9] The obstruction of justice offense alleged in the Obstruction by Falsification charge is defined in § 1519 of Title 18, and provides, in pertinent part, that

> [w]hoever knowingly alters, destroys, . . . conceals, covers up, falsifies, or makes a false entry in any record . . . with the intent to impede, obstruct, or influence the investigation . . . within the jurisdiction of any . . . agency of the United States . . . shall be [punished as provided by law].

11

general service pump.[10]  When third engineer Menente questioned Samson about why they had not been using the Separator, Samson replied that they only used the Separator in Port when surveyors came aboard to inspect the viability of the Vessel's waste disposal equipment.[11]  As Menente explained, if the Separator "wasn't used" — that is, if it was clean — there would not be "any problems with the survey" in Port.  *See* G.A. 85.[12]

The evidence also proved that Chief Engineer Ignacio and Second Engineer Samson directed their underlings in the Engine Department to improperly and illegally dispose of sludge.  The prosecution emphasized a specific illegal discharge of sludge — corroborated with pictures, but never recorded in the Oil Record Book — that occurred on or about June 14, 2015.  On that occasion, oiler Villar informed Samson that the

---

[10] Of note, during the leg of the Vessel's voyage from Korea to Panama, only one of the two bilge water storage tanks onboard the Vessel was available for bilge water storage.  The second bilge water storage tank then contained diesel fuel because, while refueling in Korea, more diesel fuel was received onboard than could be stored in the designated diesel fuel tank.  As a result, the extra diesel fuel was placed in the second bilge water storage tank, limiting the Ocean Hope's available storage space for bilge water.  The storage tank limitations, coupled with the Vessel's inability to properly use the Separator, enhanced the need for the Engine Department supervisors to direct the dumping of excess oily pollutants into the ocean.

[11] Pursuant to MARPOL, surveyors are obliged to "ensure that the structure, equipment, systems, fittings, arrangements and material fully comply with the applicable requirements."  *See* MARPOL, Annex I, Reg. 6.1.1.  If a ship is unfit to go to sea, the surveyor must take corrective action.

[12] When the Ocean Hope arrived in Wilmington in July 2015, the Oil Record Book accurately reflected that the Separator had not been used since the Vessel visited China four months earlier in February 2015.  Because an updated copy of the Oil Record Book was delivered to Oceanfleet headquarters on a weekly basis, Oceanfleet was aware that the Separator was not being used on the Ocean Hope.

sludge level in one of the sludge storage tanks was high. In response, Samson directed Villar and wiper Reyes to connect a "magic pipe" — that is, a surreptitious bypass hose — between the Ocean Hope's sludge pump and an illegal onboard discharge valve on the storage tank. After Villar and Reyes connected the magic pipe, Samson ordered them to run the sludge pump. When the Department's crewmembers ran the sludge pump, suction from the magic pipe drew sludge from the storage tank's illegal discharge valve and channeled it directly into the ocean. On that occasion, Villar and Reyes, acting at the direction of Samson, polluted the ocean with approximately ten cubic meters (2640 gallons) of sludge.

Third engineer Menente corroborated the illegal dumping of sludge from the Ocean Hope on June 14. When Menente began his shift in the Engine Room just before midnight that evening, he — along with oiler Villegas — saw the magic pipe connected to the illegal discharge valve on the sludge tank. Menente — who was immediately suspicious — captured pictures and videos of the magic pipe and its surreptitious valve connection. Sometime later, Menente saw the magic pipe in the trash after it had been disconnected from the illegal valve on the sludge tank. At that time, Menente had Villegas record a video of Menente removing part of the magic pipe from the trash for use as evidence. Menente sent those pictures and videos to his wife, and they were placed in evidence by the prosecutors. A day or two after the illegal June 14 sludge disposal from the Ocean Hope, Second Engineer Samson directed Reyes to destroy the incriminating evidence by throwing the magic pipe overboard. Reyes complied with Samson's order and pitched the magic pipe into the sea.

b.

The evidence also proved that Chief Engineer Ignacio and Second Engineer Samson had conspired to falsify and fail to accurately maintain the Ocean Hope's Oil Record Book. By way of example, oiler Villar was responsible for measuring the bilge water and sludge levels in the Vessel's seven storage tanks, a process known as "sounding the tanks." Each time Villar did so, he was required to prepare a record of the measurements called a "sounding slip." Samson routinely directed Villar to falsely reduce the measurements recorded on the sounding slips. Chief Ignacio, meanwhile, would reduce those measurements even further when he recorded them in the Oil Record Book.

The prosecution also proved that Chief Engineer Ignacio and Second Engineer Samson failed to make required entries in the Ocean Hope's Oil Record Book. For example, the Oil Record Book did not reflect that Second Engineer Samson had frequently directed the subordinate crewmembers to discharge unprocessed bilge water and sludge directly into the ocean, including the unlawful discharge of sludge on June 14, 2015.[13] Similarly, although entries were required to be made in the Oil Record Book

---

[13] The fact that Chief Engineer Ignacio and Second Engineer Samson knowingly made false entries in — and failed to make required entries in — the Ocean Hope's Oil Record Book, and that they aided and abetted such falsifications and omissions, provided strong evidentiary support for the charges alleged in Counts Two and Three.

14

when diesel fuel was pumped into the bilge water storage tank, those incidents were never recorded.[14]

The applicable regulations also require oceangoing ships to record any "failure, and the reasons for, of the oil filtering equipment" in the Oil Record Book. *See* 33 C.F.R. § 151.25(d)(6). The government proved that, on about July 2, 2015, before reaching Panama, Chief Engineer Ignacio and the Vessel's Master, a man named Tabacaru, alerted Oceanfleet headquarters that the Separator was not functioning properly. That alert was never recorded in the Oil Record Book.

## D.

### 1.

The prosecution also proved that Chief Engineer Ignacio and Second Engineer Samson sought to conceal their illicit activities from the Coast Guard both before and after the Ocean Hope's arrival in Wilmington on July 15, 2015. In the course of the voyage from Panama to Wilmington, the Engine Department's subordinate crewmembers were gathered together on the Ocean Hope and instructed on how to avoid problems during the expected Port State Control Examination by the Coast Guard (the "Port Examination"). Oceanfleet assisted in this endeavor by providing a checklist for the crewmembers to use in their preparations for the Port Examination in Wilmington. The

---

[14] The fact that Chief Engineer Ignacio and Second Engineer Samson aided and abetted each other and the Vessel's Master in failing to fully and accurately maintain the Oil Record Book provided strong evidentiary support for the Failure to Maintain charge alleged in Count Two.

Oceanfleet checklist specified several tasks to be addressed prior to entering Port. Those included: (1) ensuring that the engine room was clean and free from oil traces; (2) repairing oil leakages "permanently (if possible)"; (3) ensuring that the Oil Record Book was in order; and (4) removing oily plastic pipes. *See* G.A. 358-63. An Oceanfleet official also provided Chief Engineer Ignacio with an example of an entry for the Oil Record Book that should pass the expected Coast Guard inspection. Chief Ignacio was advised to "enter . . . on a weekly basis" in the Oil Record Book that the Separator was "tested and found satisfactory." *See* G.A. 351. Such weekly entries, of course, would be fictitious.

While the Ocean Hope was in Port in Panama, two senior Oceanfleet officials, a "Superintendent" named Prouzos and a "Port Captain" named Trousas, came aboard and travelled on the final leg to Wilmington. During their time onboard, they directed the Engine Department's subordinate crewmembers to perform certain tasks in preparation for the Port Examination — such as painting and cleaning the engine room. Of note, those officials never sought to verify whether the Engine Department had complied with MARPOL and APPS and the proper oil pollution disposal procedures during the Vessel's trip from Bangladesh.

2.

Two Coast Guard investigators — a Lieutenant named March and a Chief Warrant Officer named Libbert — testified extensively about the Port Examination and about interviewing the Engine Department crewmembers. In early July 2015, before the Ocean Hope arrived in Wilmington, the Coast Guard had been tipped off about illegal

discharges of oily pollutants — particularly sludge — from the Vessel in mid-June during its trip from Bangladesh. The informant was the spouse of third engineer Menente. Menente had forwarded his wife the photographs and videos he made of the magic pipe being used as a bypass hose on the Ocean Hope to illegally dump sludge overboard.

Immediately after initiating its Port Examination on July 15, the Coast Guard discovered that some of the Ocean Hope's firehoses were defective. Warrant Officer Libbert explained that third engineer Menente soon approached him and arranged to meet privately with the investigators. Menente then fully cooperated with the Coast Guard investigators, providing them with the pictures and videos he had taken of the magic pipe, plus the piece of the magic pipe that he had removed. Menente showed the Coast Guard investigators where and how the magic pipe had been used to dump sludge into the ocean from the Ocean Hope. After interviewing Menente, the Coast Guard investigators sounded the holding tanks and discovered that one of the bilge water tanks actually contained diesel fuel. As Lieutenant March confirmed, Menente's interview and that discovery prompted an expansion of the Port Examination into a criminal investigation.

E.

1.

The Coast Guard's criminal investigation included interviews of the Engine Department's crewmembers. Before the Coast Guard investigators could fully interview oiler Villegas, however, Chief Engineer Ignacio directed Villegas to lie to the

17

investigators and deny any knowledge of illegal pollution discharges from the Vessel.[15] Second Engineer Samson then approached Villegas, as well as fourth engineer Sarduma, and directed each of them to give false statements to the Coast Guard investigators. Villegas and Sarduma were each ordered by Samson to lie to the investigators about the use of the Separator onboard the Vessel.[16] Chief Ignacio and Samson also spoke with oiler Villar and wiper Reyes and directed both of them to deny any knowledge of unlawful sludge discharges from the Ocean Hope.[17] As a result of those corrupt efforts, each of the subordinate crewmembers in the Engine Department — except for third engineer Menente — initially lied to the Coast Guard investigators. The subordinate crewmembers who initially made false statements, however, later recanted and testified truthfully before the jury. At trial, they admitted participating in illegal pollution discharges from the Ocean Hope and confirmed that they had been ordered by their superiors to lie to the Coast Guard investigators.

---

[15] The fact that oiler Villegas was directed by Chief Engineer Ignacio to make false statements to the Coast Guard investigators at Wilmington provided evidentiary support for the witness tampering offense alleged in Count Six.

[16] The fact that oiler Villegas and fourth engineer Sarduma were directed by Second Engineer Samson to make false statements to the Coast Guard investigators at Wilmington provided evidentiary support for the witness tampering offenses alleged in Counts Seven and Eight.

[17] The fact that oiler Villar and wiper Reyes were directed by Chief Engineer Ignacio and Second Engineer Samson to lie to the Coast Guard investigators at Wilmington provided evidentiary support for the witness tampering offense alleged in Count Nine.

Second Engineer Samson, on the other hand, lied extensively to Lieutenant March during his interview about the illegal pollution activities onboard the Ocean Hope. For example, Samson told Lieutenant March that he did not know why there was oil residue in the overboard discharge equipment on the Vessel. Samson also falsely advised the Coast Guard investigators that the Ocean Hope's Separator had never been bypassed.[18] At trial, Samson testified falsely in each of those respects. Samson also denied connecting the magic pipe to the sludge tank and told the jury that he was unaware of any sludge being dumped directly overboard from the Ocean Hope. Samson denied ordering any Engine Department crewmembers to pump unprocessed bilge water into the ocean, and he maintained that he had not ordered anyone to lie to the Coast Guard investigators. Regarding the sounding slips, Samson falsely asserted that the sounding slips went directly to Ignacio, and maintained that he (Samson) never saw them.

2.

Put succinctly, the Coast Guard confirmed that the Oil Record Book contained a plethora of inaccurate and false information, and the investigation revealed that a vast amount of inculpatory information had not been properly recorded therein. The jury heard, for example, that — according to the Oil Record Book — the Ocean Hope had not offloaded sludge since September of 2014, about seven months before the Vessel's

---

[18] Second Engineer Samson's series of false statements to the Coast Guard investigators at Wilmington provided evidentiary support for the false statements offense alleged in Count Four, as well as strong support for the obstruction of justice offense alleged in Count Five.

departure from Bangladesh. The Oil Record Book also reflected the daily use of the Ocean Hope's incinerator to burn sludge. The jury was advised that frequent or daily use of a ship's incinerator, however, was "not a common thing to see," and the frequent use revealed by the Oil Record Book "struck [the Coast Guard investigator] as extremely odd." *See* G.A. 250. The Coast Guard's investigation also confirmed that the insulation on the incinerator was cracked and defective, and that such a defect would prevent sludge from burning properly.

The evidence proved that Chief Engineer Ignacio had destroyed most of the sounding slips delivered to him by oiler Villar. Indeed, Chief Ignacio was able to provide the Coast Guard with only four sounding slips during the investigation in Wilmington. Furthermore, those sounding slips failed to match any entries in the Oil Record Book. For example, the amount of sludge in the sludge tank on July 13, 2015, was falsely recorded in the Oil Record Book as 4.9 cubic meters. The sounding slip for that date provided to Chief Ignacio by oiler Villar, however, revealed that the sludge tank then contained more than 7.0 cubic meters of sludge.

The Coast Guard's investigation also revealed that the sludge pump was illegally equipped with an extra flange.[19] A flange is normally used to connect a pipe to equipment or other pipes, and is usually welded to its location. Superintendent Prouzos

---

[19] Second Engineer Samson misled the Coast Guard investigators when he falsely advised Lieutenant March that he did not know about the extra flange on the Ocean Hope's sludge pump. That fact provided further evidentiary support for the false statements offense alleged in Count Four, as well as the obstruction of justice offense alleged in Count Five.

approached Lieutenant March in Wilmington and asked to see the piping diagram of where the illegal extra flange on the sludge pump of the Ocean Hope had been discovered. The extra flange was the one that had been connected to the magic pipe during the illegal discharge of sludge from the Ocean Hope on June 14, 2015. The extra flange, however, was not shown on the Vessel's piping diagrams. And its absence rendered those diagrams false, in violation of the federal regulations. The prosecution emphasized that, under the evidence, Oceanic and Oceanfleet had owned and operated the Vessel for several years with the illegal third flange affixed to the sludge pump. During that period, no steps had been taken by the Appellants to rectify that problem.[20]

F.

1.

Oceanic and Oceanfleet argued at trial that they were not vicariously criminally liable for any of the problems revealed by the Coast Guard's investigation. The Appellants asserted that they had been wrongly prosecuted for misconduct that was confined to the Engine Department crewmembers and unknown to Oceanic and Oceanfleet. More specifically, the Appellants denied all responsibility and blamed Chief Engineer Ignacio and Second Engineer Samson for the charges in the Indictment.

---

[20] After being informed by the Coast Guard of the oil pollution activities and Oil Record Book falsifications onboard the Ocean Hope revealed by the Port Examination in Wilmington, Oceanfleet's Prouzos and Trousas promptly left for Europe. Before leaving, however, Prouzos blamed the criminal revelations made to him by the Coast Guard on those "F-ing Filipinos." *See* G.A. 254. Neither Prouzos nor Trousas had any further involvement in the Port Examination.

Oceanic and Oceanfleet called four trial witnesses, unsuccessfully seeking to convince the jury that the misconduct of Chief Engineer Ignacio, Second Engineer Samson, and the Engine Department's subordinate crewmembers had been concealed from them. The Appellants fruitlessly argued that none of the crewmembers had alerted them to any misconduct onboard the Vessel, and they maintained that they were not legally bound by any criminal activities of their Engine Department supervisors or subordinate crewmembers. Oceanic and Oceanfleet also asked the district court to rule, as a matter of law, that the sole employer of the crewmembers was Oceanic. That request was denied.

In support of their joint defense, Oceanic and Oceanfleet introduced the MARPOL certificates of Chief Engineer Ignacio and Second Engineer Samson, as well as other Engine Department crewmembers, apparently seeking to show that the Appellants had hired qualified employees that could reasonably be relied upon. One witness asserted that the "company's policy was for zero pollution from the vessel." *See* J.A. 307. The Appellants also sought to show that some of the subordinate crewmembers in the Engine Department had improper motives. For example, third engineer Menente's wife was allegedly seeking a visa into this country when she provided the Coast Guard with evidence of the Ocean Hope's illegal pollution of the ocean.

2.

During the trial proceedings, Oceanic and Oceanfleet made a series of motions — pursuant to Rule 29 of the Rules of Criminal Procedure — for judgments of acquittal. In support thereof, the Appellants argued that they could not be vicariously liable for the

criminal conduct of any of the Engine Department crewmembers.[21]   Each of those motions was denied.  After the evidence was presented, the parties rested and the lawyers argued their competing positions to the jury.

In its instructions, the district court explained that it was the jury's duty "to decide whether the government has proved beyond a reasonable doubt the specific facts necessary to find each of the defendants guilty of the crimes charged."  *See* J.A. 353. With reference to Oceanic and Oceanfleet, the jury was instructed on the vicarious liability issues that arise in these appeals.  The jury was advised that,

> [i]n addition to the required elements of each offense, in order for you to find either [Oceanic or Oceanfleet] guilty of any of these charges, the government must prove each of the following three elements:
>
> One, that the offense charged was committed by an agent or employee of [Oceanic or Oceanfleet];
>
> Second, in committing the offense, the agent or employee intended, at least in part, to benefit [Oceanic or Oceanfleet];
>
> And third, the agent or employee acted within his or their authority.

*See* J.A. 362.[22]

---

[21] With respect to the Failure to Maintain charge in Count Two, Oceanic and Oceanfleet supported their Rule 29 motions in their appellate submissions by asserting that Master Tabacaru of the Ocean Hope was the "only person . . . with the legal obligation to maintain the Oil Record Book."  *See* Br. of Appellants 38.  They argued that, because the proof of that charge was that Chief Engineer Ignacio and Second Engineer Samson were the real culprits and neither served as the Vessel's Master, Count Two had not been proven.

[22] According to the government, the jury instructions were primarily drawn from our decision in *United States v. Singh*, 518 F.3d 236 (4th Cir. 2008).

23

In connection with that instruction, the district court explained to the jury that "an agent or employee of a corporation may act for his own benefit while also acting for the benefit of an organization." *See* J.A. 363. It also instructed that "[a]n act is within the authority of an agent or employee if it concerns a matter the organization generally entrusted to that agent or employee. The organization need not have actually authorized or directed the particular act." *Id.* The jury was instructed that, even if an act was illegal or "contrary to [Oceanic and/or Oceanfleet's] instructions" or "against . . . general policies," that fact would not absolve the Appellants of criminal responsibility. *Id.* The jury was advised that it could "consider . . . how carefully [Oceanic and/or Oceanfleet] tried to enforce [the policies and instructions it had in place]" in assessing whether employees or agents of Oceanic or Oceanfleet had acted with the intent to benefit the Appellants or only to benefit themselves. *Id.*

In instructing the jury on the Failure to Maintain charge in Count Two, the district court explained that, "the government does not contend that the defendants physically committed the acts charged," but "instead . . . contends that the defendants willfully caused another person, specifically the master, or captain . . . to physically commit the crime in violation of" the aiding and abetting statute. *See* J.A. 373-74. The court then proceeded to quote the provisions of § 2(b) of Title 18 to the jury. *Id.* at 373. In instructing the jury on Count Three, the court reiterated that it had "already explained the aiding and abetting statute," but then quoted "the other part of aiding and abetting" by reading the language of § 2(a) of Title 18. *Id.* at 377. Although the Appellants

24

unsuccessfully objected to certain aspects of the jury instructions, they have not pursued any of those issues on appeal.

On September 1, 2016, after completing its deliberations, the jury returned guilty verdicts on each of the nine charged offenses. Those verdicts, as relevant here, included the nine convictions of Oceanic and Oceanfleet.

G.

1.

Prior to the sentencing proceedings, separate PSRs were prepared for Oceanic and Oceanfleet. Because of the sentencing issues being pursued in these appeals, the PSRs must be reviewed in some detail.

According to the PSRs, neither Oceanic nor Oceanfleet had an effective program to prevent or detect violations, and neither of them had self-reported the violations or cooperated with the investigation. For both Oceanic and Oceanfleet, the PSRs applied Sentencing Guidelines § 3D1.2(c), which explains the concept of grouping as to closely related offenses of conviction. The offenses of conviction of the Appellants were grouped into "Count Group 1: Obstruction of Justice and Aiding and Abetting" for Guidelines calculation purposes. *See* S.A. 16, 40. Importantly, the PSRs explained that obstruction of justice is not listed in Guidelines § 8C2.1 — the permissible fine guideline — as an offense category concerning the imposition of criminal fines against corporations. *Id.* Thus, the permissible fines against Oceanic and Oceanfleet were determined by applying Guidelines § 8C2.10. That Guideline provides that, for any conviction not covered under Guidelines § 8C2.1, the sentencing court will determine the

25

appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572. *Id.* According to the PSRs, the statutory maximum fine against Oceanic and Oceanfleet on each of their convictions was $500,000. *Id.* at 17, 41.

The PSRs then assessed self-reported, unaudited financial information that was submitted by Oceanic and Oceanfleet. The PSRs concluded that Oceanic was "profitable until the instant offense," and that Oceanfleet was profitable until 2014. *See* S.A. 15, 39. The PSRs also revealed that Oceanic and Oceanfleet — in the context of these proceedings — had posted a surety bond of $500,000 for the Ocean Hope. *Id.* Under its provisions, that bond could be applied towards fines imposed as punishment. Oceanic's PSR concluded that it was "capable of paying a significant fine in installments if the corporate defendant is placed on probation." *Id.* at 24. Similarly, Oceanfleet's PSR found that it was "capable of paying a fine in installments." *Id.* at 40.

The information provided to the sentencing court by the United States Attorney in his sentencing memorandum convincingly revealed that Oceanic was a shell entity created by Oceanfleet to serve as the registered owner of the Ocean Hope. For example, a maritime credit reporting agency characterized Oceanic as being "understood to form part of the wider group of Oceanfleet," *see* G.A. 374, and "controlled by the same principals," *id.* at 376. The PSRs also revealed a significant overlap in the management personnel of Oceanic and Oceanfleet. Of importance, Oceanic's PSR said that "Oceanic appear[ed] to be a special-purpose corporate entity that is, for all relevant purposes, under the management and control of Oceanfleet." *See* S.A. 4. Although Oceanic and

26

Oceanfleet objected to certain aspects of their PSRs, they did not object to how the PSRs handled the grouping of offenses issue.

2.

The sentencing court adopted the PSRs and, on January 11, 2017, conducted the sentencing proceedings at issue here. Oceanic was ordered to pay $675,000 in fines, plus $225,000 in restitution to the Gray's Reef National Marine Sanctuary Foundation. Oceanfleet's fines and restitution were significantly greater than those assessed against Oceanic. Oceanfleet was thus ordered to pay $1,350,000 in fines, plus $450,000 in restitution to the same foundation. Oceanic and Oceanfleet were each sentenced to probationary terms of five years, but probation could be terminated after one year if certain conditions were satisfied. As a special condition of probation, Oceanic and Oceanfleet ships were barred from ports in the United States until the financial aspects of their sentences were satisfied. This special condition extended to "all vessels managed by [Oceanic or Oceanfleet] and/or any successor, assignee, subcontractor, acquirer, affiliate or other entity related to either defendant by reason of shared or common ownership, management or control." *See* J.A. 529, 535.

Oceanic and Oceanfleet have timely appealed the criminal judgments entered against them.[23] We possess jurisdiction pursuant to 28 U.S.C. § 1291.

---

[23] The Ocean Hope supervisors who were convicted — Chief Engineer Ignacio and Second Engineer Samson — did not appeal their convictions or sentences.

## II.

### A.

In these appeals, Oceanic and Oceanfleet each present a single challenge to their convictions. That is, they maintain that the evidence was insufficient to prove corporate criminal liability. More specifically, they argue that the jury was not entitled to find beyond a reasonable doubt — with respect to any of the offenses in the Indictment — that any Ocean Hope crewmember was acting pursuant to corporate authority or with an intent to benefit Oceanic or Oceanfleet. The Appellants also assert that the sentencing court erred in four respects in imposing penalties. They contend that the court erred: (1) in grouping the various offenses; (2) by failing to consider Oceanic and Oceanfleet's independent financial conditions and separate abilities to pay the fines imposed; (3) by imposing erroneously disparate fines on Oceanfleet compared to fines on similarly situated defendants; and (4) by imposing a special condition of probation that improperly impacted related third parties.

### B.

In reviewing the sufficiency of evidence in a criminal prosecution, we look for a clear prosecutorial failure. *See United States v. Jones*, 735 F.2d 785, 791 (4th Cir. 1984). Indeed, reversal of a conviction on grounds of insufficient evidence should be confined to cases where the prosecution's failure is clear. *Id.* We are obliged to sustain a guilty verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." *See United States v. Bolden*, 325 F.3d 471, 485 (4th Cir. 2003). In making an evidence sufficiency analysis, we ask only "whether there is

28

evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *See United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007). Our precedent is that an appellant faces "a heavy burden" in challenging evidence sufficiency. *Id.*

In assessing a challenge to a sentencing court's application of the Sentencing Guidelines, we review the court's factual findings for clear error and its legal conclusions de novo. *See United States v. Allen*, 446 F.3d 522, 527 (4th Cir. 2006). We assess for abuse of discretion the reasonableness of fines imposed on a defendant. *See United States v. Walker*, 83 F.3d 94, 95 (4th Cir. 1996). If an appellant has failed to properly object and preserve an issue in the district court, we review the appellate contention for plain error only. *See United States v. Martinez*, 277 F.3d 517, 524 (4th Cir. 2002); *see also* Fed. R. Crim. P. 52(b). And we review special conditions of probation for abuse of discretion. *See United States v. Dotson*, 324 F.3d 256, 259 (4th Cir. 2003).

III.

A.

We begin our analysis by examining the contention that there is insufficient evidentiary support for the convictions of Oceanic and Oceanfleet. The Appellants each argue that the trial evidence was insufficient to prove their vicarious liability for the criminal activities of Chief Engineer Ignacio and Second Engineer Samson. In assessing the liability of a corporate defendant, we adhere to the principles explained, inter alia, in *United States v. Singh*, 518 F.3d 236 (4th Cir. 2008) and *United States v. Automated Med.*

29

*Labs., Inc.*, 770 F.2d 399 (4th Cir. 1985). Consistent therewith, we are obliged to apply the legal proposition that "a corporation is liable for the criminal acts of its employees and agents done within the scope of their employment with the intent to benefit the corporation." *See Singh*, 518 F.3d at 249 (internal quotation marks omitted). Corporate liability can also arise "if the employee or agent has acted for his own benefit as well as that of his employer." *Id.* at 250.

1.

We first assess whether the prosecution presented sufficient evidence to prove that Chief Engineer Ignacio and Second Engineer Samson were agents or employees of Oceanfleet and Oceanic. The Appellants argue that Chief Ignacio and Samson were employed by Oceanic only, and that they were not agents or employees of Oceanfleet for purposes of vicarious liability. The evidence, however, when viewed in the proper light, proved that both Oceanic and Oceanfleet were their employers.

By way of example, the Oceanfleet Manual provided that Oceanfleet was "entitled to use or appoint [to the Ocean Hope] any agents or sub-contractors as it shall deem fit." *See* J.A. 406. Samson confirmed that his paychecks came from both Oceanic and Oceanfleet, and that "Oceanic Illsabe" was written on his employment contract. Samson explained that, while working aboard the Ocean Hope, he understood that Oceanfleet was the operator of the Vessel. The crewmembers understood that they were employed by Oceanfleet. Samson — as well as third engineer Menente and fitter Belleza — confirmed that the uniforms worn by crewmembers of the Ocean Hope bore the name Oceanfleet. Of great importance, the Oceanfleet Manual was provided to the Ocean Hope

30

crewmembers by Oceanfleet itself. And the Oil Record Book updates were provided to Oceanfleet officials on a weekly basis. Put succinctly, the evidence was more than sufficient to prove that the Engine Department crewmembers were employed by both Oceanic and Oceanfleet.

2.

a.

Next, we must assess whether Chief Engineer Ignacio and Second Engineer Samson were acting within the scope of their employment when they committed the various criminal offenses charged in the Indictment. We have broadly defined the term "scope of employment" for purposes of vicarious criminal liability, and the term includes, for example, "acts on the corporation's behalf in performance of the agent's general line of work." *See Automated Med. Labs., Inc.*, 770 F.2d at 407. We therefore need to decide whether the jury heard sufficient evidence to reasonably find that the actions of Chief Ignacio and Samson fell within their "general line of work" aboard the Ocean Hope.

It was Chief Engineer Ignacio's responsibility, as required by the Oceanfleet Manual, to implement and ensure compliance by all Engine Department crewmembers with the relevant safety and pollution prevention procedures. Pursuant to the Oceanfleet Manual, Chief Ignacio was personally in charge of maintaining a complete and accurate Oil Record Book on the Ocean Hope. Similarly, Second Engineer Samson acknowledged that he was obligated — on behalf of Oceanic and Oceanfleet — to supervise and carry out his duties pursuant to the Oceanfleet Manual. And Samson had to ensure that the

31

Department's subordinate crewmembers complied with all applicable environmental policies.

The evidence proved that the Ocean Hope's Oil Record Book contained false and inaccurate entries, and that it was not accurately maintained. The evidence also proved that the Engine Department's subordinate crewmembers had been trained that "orders are given and expected to be obeyed down the chain of command without hesitation or question," as required by the Oceanfleet Manual. *See* G.A. 344. As a result, the subordinate crewmembers acted within the scope of their employment in complying with the directives of Chief Ignacio and Samson.

b.

Oceanic and Oceanfleet nonetheless contend on appeal that the activities of Chief Engineer Ignacio and Second Engineer Samson exceeded the scope of their duties, in that the Engine Department crewmembers had acted illegally and contrary to company policies. The Appellants also argue that they are not vicariously liable because the Department's crewmembers did not report any illegal conduct to responsible corporate officials at Oceanic or Oceanfleet. Those contentions are meritless.

The fact that the actions of the Engine Department crewmembers were illegal or contrary to corporate policy does not absolve either Oceanic or Oceanfleet of criminal responsibility. *See Automated Med. Labs.*, 770 F.2d at 407 (explaining that, although an agent acting within the scope of his employment acted unlawfully "and contrary to corporate policy," that fact did not "absolve [the company] of legal responsibility for [the agent's] acts"). In a somewhat analogous situation, the Second Circuit recognized that

32

"crew members acted within their authority to maintain the engine room, discharge waste, and record relevant information when they used [a] 'magic [pipe].'" *See United States v. Ionia Mgmt.*, 555 F.3d 303, 309 (2nd Cir. 2009).

Consistent with the district court's instructions, the jury weighed the purported corporate policies of Oceanic and Oceanfleet. And the jury was entitled to find — on the evidence — that none of those policies absolved the Appellants of criminal liability. Put simply, Chief Engineer Ignacio and Second Engineer Samson consistently ordered the subordinate crewmembers to violate MARPOL, APPS, various federal criminal statutes, and the applicable regulations.[24]

The evidence was that Oceanfleet received and reviewed the Ocean Hope's Oil Record Book on a weekly basis, and that the Appellants made recommendations to the Engine Department crewmembers on how to satisfy the Coast Guard's inspection. From those weekly updates of the Oil Record Book, Oceanfleet was on notice of multiple oddities. For example, Oceanfleet was aware that the Separator had broken on about July 2, 2015, and thus knew that the Separator's malfunction on that occasion was not properly recorded in the Oil Record Book. Oceanfleet also knew that the Oil Record Book falsely reflected that the Ocean Hope had not offloaded sludge since September 2014. And Oceanfleet knew that the incinerator was being used on a daily basis. The

---

[24] The jury also heard from three Engine Department subordinate crewmembers who were fearful of reporting illegal misconduct on the Vessel. For example, fourth engineer Sarduma and oiler Villegas both told the jury that they were afraid to report the illegal activities they saw occurring onboard the Ocean Hope. *See* G.A. 173a, 178, 196.

Appellants, however, never inquired about any of these suspicious events. In the circumstances, the jury was entitled to infer the worst as to Oceanic and Oceanfleet. That view, in favor of the prosecution, was that the Appellants were well aware of the systematic criminal misconduct of their supervisors concerning the Oil Record Book.

Oceanic and Oceanfleet also contend on appeal that Chief Engineer Ignacio and Second Engineer Samson consistently acted only to benefit themselves and not to benefit either Oceanic or Oceanfleet. We have never required the prosecution to prove, however, that a corporate defendant, "presumably as represented by its upper level officers and managers, had an intent separate from that of its lower level employees." *See United States v. Basic Constr. Co.*, 711 F.2d 570, 573 (4th Cir. 1983). As long as the corporate agent intends, at least in part, to benefit his employer, the corporate entity can be criminally liable, even if the agent is also acting for his own benefit. *See Singh*, 518 F.3d at 249 ("The appropriate scope of employment of such an employee or agent has been defined to include all those acts falling within the employee's or agent's general line of work, when they are motivated — at least in part — by an intent to benefit the corporate employer." (internal quotation marks omitted)). Importantly, the trial court's careful instructions to the jury were entirely consistent with that established legal principle.

In assessing the evidence for sufficiency, "[w]e review both direct and circumstantial evidence, and accord the government all reasonable inferences from the facts shown to those sought to be established." *See United States v. Cone*, 714 F.3d 197, 212 (4th Cir. 2013). The trial evidence was more than sufficient for the jury to infer that the intended beneficiaries of the illegal conduct on the Ocean Hope were Oceanic and

34

Oceanfleet. By way of example, the jury knew of the Appellants' profound concern with avoiding the detainment of the Ocean Hope in Wilmington because of the Coast Guard investigation. To avoid that problem, Oceanfleet provided the Engine Department's crewmembers with a checklist to complete before arriving in Wilmington. It also provided Chief Engineer Ignacio with sample Oil Record Book entries, which were themselves false and fraudulent.

Oceanfleet had a Port Captain and a Superintendent board the Ocean Hope in Panama to oversee the Vessel's preparations for the Coast Guard in Wilmington. Second Engineer Samson advised the Engine Department's subordinate crewmembers not to use the Separator unless it was for survey, in order to keep the Separator clean for the Port Examination. And Samson advised the subordinate crewmembers not to tell the Coast Guard investigators about illegal discharges of sludge. In those circumstances, the jury was entitled to find that Chief Engineer Ignacio and Samson intended to prevent the Coast Guard from finding any deficiencies onboard the Ocean Hope which might cause the Vessel to be detained or delayed in Wilmington.

In sum, voluminous false entries were made in the Ocean Hope's Oil Record Book. And the Oil Record Book was not maintained accurately and completely. Instructions from Chief Engineer Ignacio and Second Engineer Samson to the subordinate crewmembers were that they had to lie to the Coast Guard investigators. Additional false statements were made by Samson that constituted incriminating efforts — attributable to the Appellants — to assist the Vessel in passing the Port Examination. *See Automated Med. Labs.*, 770 F.2d at 407 (concluding that an agent was acting in part

35

to benefit his employer when the employer's "well-being" rested on "its lack of difficulties with the FDA"). Even if Chief Ignacio and Samson had personal motives to obstruct the Coast Guard investigation (and none were offered or shown) — or if they intended to otherwise conceal their unlawful acts from the Coast Guard investigators — we nevertheless view the evidence in the light most favorable to the prosecution. Viewed in that light, Chief Ignacio and Samson were motivated to benefit Oceanic and Oceanfleet. *See Singh*, 518 F.3d at 249.

c.

In challenging their convictions on the Failure to Maintain charge in Count Two, Oceanic and Oceanfleet pursued a refined contention that they were entitled to judgments of acquittal because Master Tabacaru was the "only person with the legal obligation to maintain the Oil Record Book."[25] To support that proposition, they primarily rely on the Fifth Circuit's decision in *United States v. Fafalios*, which recognized that "[c]hief engineers on foreign-flagged vessels cannot . . . be prosecuted simply for having failed to maintain an oil record book once a ship enters U.S. waters, since 33 C.F.R. § 151.25 assigns that duty explicitly and exclusively to the 'master or other person having charge of the ship.'" *See* 817 F.3d 155, 162 (5th Cir. 2016). Oceanic and Oceanfleet also maintain that, on the evidence presented, Master Tabacaru was not shown to have "knowingly fail[ed] to maintain" the Oil Record Book, nor to have permitted the

_____

[25] As we see it, Oceanic and Oceanfleet properly preserved their refined Count Two contention at trial, arguing to the court that they could not "aid and abet" themselves. *See* J.A. 280-81.

36

supervising crewmembers to falsify any entries made — or omitted to be made — in the Oil Record Book. *See* Br. of Appellants 38. Oceanic and Oceanfleet therefore contend that they cannot be held vicariously liable on the Failure to Maintain charge.

This refined theory of criminal liability must also fail, in that Oceanic and Oceanfleet were proven vicariously liable for the criminal acts of Chief Engineer Ignacio and Second Engineer Samson in aiding and abetting the failure of Master Tabacaru to maintain an accurate Oil Record Book. Indeed, Oceanic and Oceanfleet admit in their appellate submissions that "[t]here is no dispute" that Chief Ignacio and Samson "were permissibly prosecuted and convicted under the aiding and abetting theory of liability for causing the Master to fail to maintain an accurate" Oil Record Book. *See* Br. of Appellants 39. The explicit provisions of § 2(a) of Title 18 further undermine the Appellants' refined contention on Count Two. Since the time that statutory provision was amended in 1951, any distinction between an aider and abettor of an offense, on the one hand, and a principal offender, on the other, has been abolished. *See Standefer v. United States*, 447 U.S. 10, 18 n.11 (1980). That is, "[w]hoever . . . aids [or] abets" the commission of an offense against the United States "is punishable as a principal." *See* 18 U.S.C. § 2(a).

As the Fifth Circuit emphasized in its *Fafalios* decision, the crewmembers of a ship, other than the master thereof, "may be prosecuted for aiding and abetting the failure to maintain an accurate" Oil Record Book. *See* 817 F.3d at 162. And we have already recognized that the criminal actions of Chief Engineer Ignacio and Second Engineer Samson fell within the scope of their duties on the Ocean Hope, and that they intended

37

for those actions to benefit Oceanic and Oceanfleet. As we have heretofore explained, "[a] person aids and abets a crime when . . . he intends to facilitate the offense's commission." *See BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*, 881 F.3d 293, 309 (4th Cir. 2018) (internal quotation marks omitted). Viewed in the proper light, Chief Ignacio and Samson aided and abetted Master Tabacaru's failure to maintain an accurate Oil Record Book. This refined contention of error as to Count Two is therefore also rejected.

d.

Consistent with the foregoing, Oceanic and Oceanfleet are unable to successfully challenge the sufficiency of the trial evidence. The district court thus did not err in denying the various motions for judgments of acquittal, and the guilty verdicts returned by the jury are amply supported by the evidence.

B.

Next, we turn to Oceanic and Oceanfleet's contentions regarding the sentences imposed by the district court.[26] The Appellants claim that the court erred in four respects:

---

[26] When we refer herein to the "sentences" imposed on Oceanic and Oceanfleet, we mean the fines, restitution awards, periods of probation, and conditions of probation. Furthermore, the sentencing court and the parties have variously referred to the fines and restitution awards as fines, financial penalties, special assessments, and community service payments. Because the distinctions between fines and restitution awards do not alter or impact the resolution of these appeals, we sometimes collectively refer to them as "fines" or "financial penalties."

- by failing to properly group Counts Two and Three as well as Counts Six through Nine (the "grouping contention");

- by failing to consider Oceanic and Oceanfleet's independent financial conditions and separate abilities to pay the fines imposed (the "excessive fine contention");

- by imposing erroneously disparate fines on Oceanfleet compared to fines on similarly situated defendants (the "disparate fine contention");[27] and

- by imposing, as a special condition of probation, a five-year ban from ports in the United States of ships of the Appellants and related third parties (the "probation condition contention").

We will address the sentencing contentions in turn.

1.

In their grouping contention, the Appellants maintain that the sentencing court failed to properly "group" the offenses of conviction. The relevant Guideline provision — USSG § 3D1.2 — provides that "counts involving substantially the same harm shall be grouped together in a single Group." Counts are deemed to allege substantially the same harm when, inter alia, "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." *See* USSG § 3D1.2(c). Oceanic and Oceanfleet contend that Counts Two and Three and Counts Six through Nine alleged substantially the same criminal conduct, and thus should have been grouped together for sentencing purposes.

---

[27] As indicated below, the disparate fine contention is being pursued by Oceanfleet only. Oceanic does not pursue such a contention.

Had the court done so, according to Oceanic and Oceanfleet, their permissible fines would have been substantially reduced.

Importantly, Oceanic and Oceanfleet did not present the grouping contention to the sentencing court, either by challenging the PSRs or by objecting in the sentencing proceedings. When a defendant has not properly preserved a sentencing error and failed to provide the lower court with an opportunity to correct the alleged error, we can review the appellate contention for plain error only. *See United States v. Boykin*, 669 F.3d 467, 470 (4th Cir. 2012). In conducting plain error review, we assess: (1) whether there is an error; (2) whether the error is clear or obvious; and (3) whether the error affected the appellant's substantial rights. *See United States v. Olano*, 507 U.S. 725, 734 (1993). To satisfy the third requirement of the plain error test, the appellant must show that the error actually "affected the outcome of the district court proceedings." *Id.* Even when all three of these requirements are satisfied, "we have discretion whether to recognize the error, and should not do so unless the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *See United States v. Hargrove*, 625 F.3d 170, 184 (4th Cir. 2010) (quoting *Olano*, 507 U.S. at 736).

Put simply, we discern no error in the sentencing court's handling of the grouping question in this case. And Oceanic and Oceanfleet failed — in their appellate submissions — to grapple with the fact that their PSRs actually grouped their offenses of conviction into a single group: "Count Group 1: Obstruction of Justice and Aiding and Abetting." *See* S.A. 16, 40. The Guideline applicable to an obstruction of justice offense directs the court to "determine an appropriate fine by applying the provisions of 18

40

U.S.C. §§ 3553 and 3572." *See* USSG § 8C2.10; *see also* USSG § 2J1.2(a); USSG § 8C2.1. Neither § 3553 nor § 3572, however, requires a court to group the offenses of conviction prior to imposing a fine. Rather, those statutes direct the court to consider certain sentencing factors and impose a sentence "sufficient, but not greater than necessary" to serve the ends of justice. *See* 18 U.S.C. § 3553; *see also* 18 U.S.C. § 3572. The record confirms that the court considered those factors, and it then imposed financial penalties — totalling $900,000 for Oceanic and $1,800,000 for Oceanfleet — that were substantially less than the statutory maximum of $4,500,000. *See* 18 U.S.C. § 3571(c)(3) (establishing maximum fine of $500,000 for each felony offense of conviction).[28]

Assuming that the sentencing court erred in grouping Oceanic and Oceanfleet's offenses of conviction, the grouping contention fails to satisfy the requirements of plain error review. *See United States v. Seignious*, 757 F.3d 155, 166 (4th Cir. 2014) (assuming error in context of plain error review and "jumping straight" to second and third prongs of analysis). Put succinctly, the grouping contention is by no means plainly erroneous. A "plain" error is said to be an error so "clear or obvious" that it jumps off the page. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). The Appellants, however, do not even argue on appeal that the court committed an obvious error. Indeed, they have

---

[28] Section 3571(c)(3) of Title 18 provides for a statutory maximum fine of $500,000 on a corporate defendant convicted of a felony. Oceanic and Oceanfleet were each convicted of nine felonies, resulting in a statutory maximum aggregate fine of $4,500,000 for each of them.

failed to argue that the grouping contention satisfies any of the requirements of plain error review. In these circumstances, the grouping contention must be rejected.

2.

In their excessive fine contention, Oceanic and Oceanfleet maintain that the sentencing court erred by failing to properly consider the sentencing factors identified in 18 U.S.C. §§ 3553(a) and 3572. The Appellants objected to their fines at sentencing — after the fines had been imposed — on the ground that neither Oceanic nor Oceanfleet had the financial wherewithal to pay them.[29] The Appellants thus preserved their excessive fine contention for these appeals, and we assess that contention for abuse of discretion. *See United States v. Walker*, 83 F.3d 94, 95 (4th Cir. 1996).

Pursuant to the PSRs, the criminal conduct of Oceanic and Oceanfleet falls within Sentencing Guidelines § 8C2.10. *See* S.A. 16, 40. That Guideline provision directs a sentencing court to determine appropriate fines for a corporate entity by looking to 18 U.S.C. §§ 3553 and 3572. Section 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary" to reflect the severity of the offense, to provide just punishment for the offense, to deter future criminal conduct, and to protect

---

[29] When asked by the district court if there were any objections to the sentence being imposed on Oceanic, its counsel replied "Yes sir. The fine that has been imposed is an improper fine because it is a fine which can never be paid based on the company's financial situation." *See* J.A. 523. The lawyer, who represented the Appellants jointly, raised the same objection to the fines imposed on Oceanfleet. *Id.* The court overruled both objections.

the public from future crimes by the defendant. *See* 18 U.S.C. § 3553(a)(2). In pursuing

that end, the court should consider several factors, including:

- the nature and circumstances of the offense and the history and characteristics of the defendant;

- the need for the sentence imposed;

- the pertinent policy statements;

- the need to avoid unwarranted sentence disparities among defendants with similar records; and

- the need to provide restitution.

*See* 18 U.S.C. § 3553(a)(1)-(7). Section 3572 of Title 18, entitled "Imposition of a

sentence of fine and related matters," directs a court to consider other factors that are

similar to those enumerated in Section 3553.[30]

At the oral argument of these appeals, Oceanic and Oceanfleet maintained that the

sentencing court failed to analyze any of the § 3572 factors. That contention — even if

valid — would not warrant relief on the excessive fine contention. As we have

recognized, specific findings as to each factor in § 3572(a) are unnecessary, and a court

"may satisfy [the requirements of § 3572(a)] if it adopts a defendant's presentence

investigation report . . . that contains adequate factual findings to allow effective

appellate review of the fine or restitution." *See United States v. Castner*, 50 F.3d 1267,

---

[30] For example, § 3572 of Title 18 directs a sentencing court to consider the income, earning capacity, and financial resources of the defendant; the burden that a fine will impose on the defendant; whether restitution is being ordered; the size of the organization; and any measures taken by the organization to prevent a recurrence of offenses.

1277 (4th Cir. 1995). As with the § 3553(a) factors, we need "not vacate [a] sentence simply because the [sentencing] court did not spell out what the context of its explanation made patently obvious." *See United States v. Montes-Pineda*, 445 F.3d 376, 381 (4th Cir. 2006) (internal citations omitted). Put simply, a court "need not robotically tick through § 3553(a)'s every subsection." *Id.* at 380 (internal quotation marks omitted).

After carefully considering the arguments of the prosecution and the defense, the sentencing court "[found] the basis for the findings contained in the presentence report [to be] credible and reliable, and therefore, adopt[ed] those findings." *See* J.A. 517; 520. And the PSRs contained adequate findings for appellate review, in that they specifically described Oceanic and Oceanfleet's abilities to pay. *See* S.A. 14-15; 38-39. Indeed, neither Oceanic nor Oceanfleet argues that the court misapprehended their abilities to pay the financial penalties imposed.

The financial information with respect to Oceanic and Oceanfleet that is reflected in the PSRs was self-reported and unaudited. Oceanic's PSR indicates that Oceanic sold the Ocean Hope — its only asset — in 2016, a year after the events giving rise to this prosecution. Oceanic reported a profit of nearly $5,000,000 in 2015, indicating that the Ocean Hope was profitable around the time the illegal pollution conduct occurred. Oceanfleet's PSR reflected that it had "10.8 vessels under management and [was] generating significant revenue." *See* S.A. 37. Therefore, Oceanfleet's PSR explained that "based on the continued receipt of revenues," Oceanfleet had the ability to pay a fine "if allowed to do so in installments." *Id.* at 40. The PSRs did not recommend any specific fines for either Oceanic or Oceanfleet. Nonetheless, even if a corporate

44

defendant has a negative net monthly cash flow at sentencing, that fact "does not necessarily indicate an inability to pay, particularly when their PSRs reflect past success in business and above average earning capacities." *See Castner*, 50 F.3d at 1278.

When calculating the Appellants' aggregate financial penalties — $1,800,000 for Oceanfleet and $900,000 for Oceanic — the sentencing court accepted and understood the factual findings in the PSRs and explained that the court had "considered the statutory issues as well as the factors provided in [§ 3553(a)]." *See* J.A. 517. The court carefully considered the pertinent public interests of "punishment, deterrence and recidivism," which mirror the factors in § 3553(a) that call for providing just punishment and deterrence. *Id.* at 515. The court also weighed the findings of the PSRs which reflect past business success by both Oceanic and Oceanfleet, and confirmed their abilities to pay fines in installments.

The sentencing court also considered the inculpatory findings of the PSRs that explained that "neither company acknowledged the discharges occurred or provided information from their internal investigations to the Coast Guard." *See* S.A. 11, 33. Addressing the illegal extra flange found on the sludge pump, the PSRs revealed that neither Oceanic nor Oceanfleet "took any steps to rectify the piping or . . . ensure that [the Ocean Hope] did not have [an] illegal connection." *Id.* at 7, 31-32. In these circumstances, we perceive no abuse of discretion by the court in the amounts of the financial penalties that were imposed. The excessive fine contention is therefore rejected.

3.

45

The disparate fine contention is pursued by Oceanfleet only, and it has two subparts. Both aspects of the disparate fine contention are predicated on the sentencing court's alleged contravention of Section 3553(a)(6) of Title 18. Section 3553(a)(6) requires a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6). In the first part of its disparate fine contention, Oceanfleet argues that the court erred by imposing a greater fine on Oceanfleet than on Oceanic, in that the Appellants were convicted of the same offenses. In the second part of that contention, Oceanfleet argues that the court erred by imposing a greater financial penalty on Oceanfleet than was imposed on a corporate defendant convicted of pollution offenses several years ago in the Eastern District of Virginia. *See United States v. Diana Shipping Servs., S.A.*, 985 F. Supp. 2d 719 (E.D. Va. 2013). Because Oceanfleet did not pursue these arguments in the lower court, we review them for plain error only. *See Boykin*, 669 F.3d at 470.

Put simply, the foregoing contentions are nearly spurious. First, assuming the sentencing court plainly erred in imposing a greater financial penalty on Oceanfleet — the parent entity — than it imposed on Oceanic, Oceanfleet has not shown how that error could have affected its substantial rights. *See Seignious*, 757 F.3d at 166. In *Seignious*, we concluded that a criminal defendant's substantial rights were not affected where the defendant could not show that the "amount of restitution the district ordered [the defendant] to pay . . . would have been any different" but for the alleged error. *Id.* Similarly, Oceanfleet cannot show that the court would have imposed a lesser financial

penalty on Oceanfleet had it timely presented its disparity issue to the lower court. Indeed, that court might have agreed with Oceanfleet's disparate fine contention and increased Oceanic's financial penalties to equal those of Oceanfleet. In these circumstances, therefore, we are unable to rule that Oceanfleet's substantial rights were affected. This aspect of the disparate fine contention thus fails under the third prong of plain error review. *See Olano*, 507 U.S. at 732.

The sentencing court also did not err — plainly or otherwise — by imposing a greater fine on Oceanfleet than the court imposed on the defendant in the *Diana Shipping* case. The *Diana* defendant — a ship operator — was convicted of eleven offenses arising from its failure to properly record the disposal of bilge water in its Oil Record Book. *See* 985 F. Supp. 2d at 722. According to Oceanfleet, the *Diana* court imposed an aggregate fine of $1,100,000 on those convictions — approximately $700,000 less than Oceanfleet's aggregate financial penalty. *See* Br. of Appellants 48-49. Oceanfleet requests that we vacate its financial penalty in light of that disparity. We are satisfied to reject that request for at least two reasons.

First, although Oceanfleet and the *Diana* defendant were convicted of similar offenses, the defendant in *Diana* was not shown as similarly situated to Oceanfleet. For example, the *Diana* court credited the defendant for accepting responsibility for the actions of its employees and moving swiftly to implement procedures to preempt additional violations of federal law. *See* Sentencing Tr. at 43, *Diana Shipping Servs., S.A.*, No. 2:13-cr-40 (E.D. Va. Dec. 18, 2013), ECF No. 151. Oceanfleet, by contrast, maintained its innocence throughout the sentencing proceedings, and has never

47

acknowledged that its environmental safety training and compliance procedures are inadequate to prevent reoccurrences of the criminal conduct that occurred on the Ocean Hope. *See* S.A. 35; *see also* S.A. 38 (specifying in Oceanfleet's PSR that "it does not appear that the corporate defendant had an effective program to prevent or detect violations.").

Second, we are aware of no precedent that requires district courts in separate districts to impose nearly identical fines on corporate defendants convicted of similar criminal offenses. The sentencing court in this case was directed to impose fines on Oceanfleet by applying the sentencing factors set forth in 18 U.S.C. §§ 3553 and 3572. And Section 3572(a)(6) required the sentencing court to take into account Oceanfleet's "income, earning capacity, and financial resources" in imposing financial penalties. The individualized nature of those factors will necessarily result in different penalties being imposed on different defendants. Indeed, discrepancies in income and earning capacity in all likelihood contributed to the distinctions between the penalties imposed on Oceanfleet — the parent entity of at least ten subsidiary-like entities — and the *Diana* defendant, which was a subsidiary of a large publicly traded company. *See* Def. Sentencing Mem. at 11, *Diana Shipping Servs., S.A.*, No. 2:13-cr-40 (E.D. Va. Nov. 29, 2013), ECF No. 134. In these circumstances, the sentencing court did not err in imposing a greater financial penalty on Oceanfleet than the Virginia federal court apparently imposed on the *Diana* defendant.

4.

48

Finally, in their probation condition contention, Oceanic and Oceanfleet argue that it was improper for the sentencing court to impose a ban on ships managed by Oceanfleet and Oceanic from all ports in the United States, for a maximum period of five years, or until they paid their financial penalties. Although we would normally review such an issue for abuse of discretion, the Appellants did not object to the special condition of probation when it was imposed. *See United States v. Dotson*, 324 F.3d 256, 259 (4th Cir. 2003). Therefore, we assess the probation condition contention for plain error only. *See Olano*, 507 U.S. 725, 734.

The Appellants argue that the five-year ban (contingent upon failure to pay financial penalties) — which extended to "all vessels managed by [Oceanic or Oceanfleet] and/or any . . . entity related to either defendant by reason of shared or common ownership, management or control" — improperly punished innocent third parties for the criminal actions of the Appellants. *See* J.A. 529, 535. A sentencing court is, in its discretion, entitled to impose such special conditions so long as they "are reasonably related to the factors set forth in section 3553(a)(1) and (a)(2)." *See* 18 U.S.C. § 3563(b)(22).

As the government emphasizes, the sentencing court's special condition of probation — that extended to any "entity related to either defendant by reason of shared or common ownership, management or control" — was reasonably related to the sentencing factors listed in 18 U.S.C. § 3553(a). *See* J.A. 529, 535. In particular, the special condition was directly tied to the need to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide

49

restitution to . . . victims." *See* 18 U.S.C. § 3553(a)(2)(B)-(C), (7). The PSRs revealed that it is a common practice for international shippers, such as Oceanfleet, to operate through special-purpose subsidiary entities like Oceanic. Indeed, the PSRs reflect that Oceanfleet manages and controls at least ten other ships in this manner. It was therefore reasonable for the court to conclude that, if its special condition of probation did not extend to other special-purpose entities managed by Oceanfleet, those entities would continue to operate freely in the ports of the United States. The special condition of probation was thus entirely reasonable and its imposition was not an abuse of the court's discretion. Because no error was committed, there can be no plain error. The probation condition contention is therefore also rejected.

## IV.

Pursuant to the foregoing, we reject Oceanic and Oceanfleet's various contentions of error regarding their convictions and sentences. We are therefore satisfied to affirm the criminal judgments that are challenged in these appeals.

*AFFIRMED*