

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-2006

# USA v. Abrogar

Precedential or Non-Precedential: Precedential

Docket No. 06-1215

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Abrogar" (2006). *2006 Decisions.* Paper 509.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/509

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 06-1215

UNITED STATES OF AMERICA

v.

NOEL ABROGAR,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 05-cr-00649
District Judge: The Honorable Joseph H. Rodriguez

_____

Argued July 11, 2006

Before: SMITH, ALDISERT, and ROTH, *Circuit Judges*

_____

(Filed:  August 18, 2006)

_____

Counsel:    Carl R. Woodward, III (Argued)
            Kenneth L. Winters
            Carella, Byrne, Bain, Gilfillan,
            Cecchi, Stewart & Olstein
            5 Becker Farm Road
            Roseland, New Jersey 07068
            *Counsel for Appellant*

            Michael T. Gray (Argued)
            Sue Ellen Wooldridge

John Smeltzer
Joseph Poux
Department of Justice
P.O. Box 23795 (L'Enfant Plaza
Station)
Washington, D.C. 20026-3795
*Counsel for Appellee*

---

## OPINION OF THE COURT

---

SMITH, *Circuit Judge*.

Appellant Noel Abrogar pleaded guilty to a one-count Information charging him with failing to keep an accurate "oil record book" in violation of 33 U.S.C. § 1908(a), part of the legislation implementing an international anti-pollution treaty to which the United States is a signatory. On appeal, Abrogar challenges the District Court's application of a six-level sentencing enhancement pursuant to § 2Q1.3 of the United States Sentencing Guidelines (the "Guidelines"), arguing in relevant part that under the text of § 2Q1.3 and other applicable Guidelines provisions, his offense did not "result[] in" the repeated discharges of oily waste upon which the sentencing enhancement was based. We agree. Accordingly, we will vacate Abrogar's sentence and remand the case to the District Court for resentencing.[1]

### I.

### A.

Pollution discharges from ships are regulated by both U.S. and international law. The Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901 *et seq.*, implements two related

---

[1]Abrogar also argues that the proper definition of "environment" in § 2Q1.3 excludes the discharges at issue here, and that, in any event, foreign conduct may not be considered in sentencing under the Guidelines. Because our reading of the "resulted in" language of § 2Q1.3, without more, dictates that we remand the case for resentencing, we need not reach these issues.

treaties to which the United States is a signatory. The first is the 1973 International Convention for the Prevention of Pollution from Ships, referred to as the MARPOL Protocol. The second is the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships. Together, the two treaties are generally referred to as MARPOL 73/78 ("MARPOL"), and more than 95% of the world's shipping tonnage is transported under the flags of signatories to these treaties.

Annex I to MARPOL sets forth regulations for the prevention of pollution by oil from ships. APPS authorizes the U.S. Coast Guard to issue regulations implementing the requirements of these two treaties. 33 U.S.C. §§ 1903 and 1907. The Coast Guard has issued such regulations incorporating MARPOL requirements. *See* 33 C.F.R. § 151.01 *et seq*.

Annex I sets out, *inter alia*, the international standards for the maximum amount of oil permitted to be discharged from ships. MARPOL also requires ships to have and maintain several pieces of equipment intended to work together to measure the oil content of various waste and bilge discharges from ships and to divert discharges containing too much oil to storage tanks rather than allowing them to be discharged from the ship into the ocean.

In addition to prohibitions on oily waste discharges, the treaties require each oil tanker over a given weight to maintain a record known as an oil record book. MARPOL Annex I, Reg. 20(1). The oil record book must include records for (1) all transfers of oil; (2) management and disposal of oily wastes generated on board the vessel, including any discharges of dirty ballast or cleaning water from fuel oil tanks; and (3) the disposal of oily residues such as sludge, as well as discharges of bilge waste that has accumulated in machinery spaces. *Id.* at Reg. 20(2). Accidental or emergency discharges of oil or oily waste greater than 15 or 100 parts per million ("ppm") must also be recorded. These entries in the oil record book must be signed by the person in charge of the operation (in this case, Abrogar). *Id.* at Reg. 20(3). The oil record book must be maintained on board for not less than three years and must be kept on board the vessel and readily available at all reasonable times. *Id.*

The Coast Guard has the authority to board and examine the oil record book of any vessel while that vessel is in U.S. waters or

at a U.S. port. 33 U.S.C. § 1904(c); 33 C.F.R. § 151.23(a)(3) and (c). The U.S. is a party to the international regime embodied in MARPOL and other treaties that require the country in which a ship is registered, known as the "flag state," to certify a ship's compliance with international standards. "Port states," such as the U.S. in this instance, conduct inspections to ensure compliance in their ports and waters. In conducting inspections, the Coast Guard typically relies on a ship's oil record book and statements of the crew to determine whether the crew is properly handling oil-contaminated water and its disposal. Failure of a ship to comply with MARPOL requirements can form the basis for U.S. action to refuse to allow that ship to enter port, to prohibit the ship from leaving port without remedial action, to refer the matter to the flag state of the vessel, or where appropriate, to prosecute the violation in the United States. *See* 33 U.S.C. § 1908.

B.

Noel Abrogar is a citizen of the Philippines and served as the Chief Engineer on the Motor Vessel Magellan Phoenix (the "Magellan"), a Panamanian-flagged ship managed by a Japanese company with corporate headquarters in Tokyo, Japan. Abrogar's term of service as Chief Engineer began when he boarded the Magellan on or about December 23, 2004, in Rotterdam. He was responsible for supervising the other engineers and oilers who worked in the engine room and for maintaining the ship's oil record book.

On March 25, 2005, Coast Guard inspectors conducted a port-control inspection of the Magellan to determine, *inter alia*, compliance with MARPOL requirements. In the course of their inspection and subsequent investigation, inspectors discovered that shortly after departing Rotterdam in December of 2004, Abrogar learned that a crew member intended to execute an improper discharge of bilge waste into the ocean. Abrogar did nothing to prevent the discharge. Prior to the ship's arrival in Panama on January 4, 2005, Abrogar made an entry in the oil record book indicating that the bilge waste and oily water from the improper discharge (and perhaps other, earlier improper discharges) had been incinerated.

The inspectors also learned that at least four other times, Magellan crew members under Abrogar's command – and with his

4

knowledge – discharged oil sludge and other oil-contaminated waste into the ocean. Abrogar himself issued the order to discharge on at least one of these occasions. He continued to knowingly make false entries in the oil record book and intentionally failed to record the improper discharges in an attempt to conceal those discharges. During the inspection and subsequent Coast Guard investigation, Abrogar lied to inspectors and denied knowing about any illegal discharges. He maintained that his recordings in the oil record book were accurate.

Abrogar eventually admitted to his knowledge of the improper discharges, his ordering of one such discharge, and his falsification of the oil record book. On September 7, 2005, Abrogar pled guilty to a one-count Information charging him with failing to maintain an accurate oil record book as required by 33 C.F.R. § 151.25, in violation of 33 U.S.C. § 1908(a).

The Pre-Sentence Report correctly stated that the applicable Guidelines section in the case is § 2Q1.3, which provides for a base offense level of six. The report also recommended a six-level enhancement pursuant to § 2Q1.3(b)(1)(A) ("Specific Offense Characteristics"), which provides for such an enhancement if "the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment." Although the District Court noted the tension between a "jurisdictional question and . . . what appears to be the broad sweep of the relevant conduct factors," the Court accepted the recommendation for the six-level enhancement and, owing to the enhancement as well as other sentencing factors, sentenced Abrogar to 12 months and one day of imprisonment followed by three years of supervised release. Abrogar timely appealed, specifically challenging the six-level increase under § 2Q1.3(b)(1)(A) as an "incorrect application of the sentencing guidelines" under 18 U.S.C. § 3742(a)(2). We granted Abrogar's motion to expedite the appeal and now address the District Court's application of the sentencing enhancement.

C.

The District Court had original jurisdiction pursuant to 18 U.S.C. § 3231. We exercise appellate review under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2), granting U.S. courts of appeals jurisdiction to review sentences "imposed as a result of an incorrect application of the sentencing guidelines." 18 U.S.C. § 3742(a)(2).

We review the District Court's interpretation of the Guidelines *de novo*.[2] *United States v. Pojilenko*, 416 F.3d 243, 246 (3d Cir. 2005) (quoting *United States v. Booker*, 543 U.S. 220, 259 (2005)).

## II.

## A.

The Government's primary argument in favor of the sentencing enhancement is textual in nature and runs essentially thus: the repeated discharges directed and knowingly allowed by Abrogar are "relevant conduct" *vis-a-vis* his offense of failure to maintain an accurate oil record book. Under the text of the Guidelines, the definition of "offense" includes the "offense of conviction" and all "relevant conduct." As such, Abrogar's "offense" as defined by the Guidelines "resulted in" repeated discharges of a pollutant, and the District Court properly applied the six-level sentencing enhancement.

We begin our analysis with the text of the relevant provisions of the Guidelines. As mentioned above, the six-level sentence enhancement adopted by the District Court was proper under § 2Q1.3 of the Guidelines only if Abrogar's "offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment." *Id.* Section 1B1.1 of the Guidelines defines one's "offense" as "the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 1B1.1, application note 1(H). The parties here have referred to § 1B1.3(a)(1), which defines "relevant conduct" as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that

---

[2]This Court has held that even under the post-*Booker* advisory Guidelines regime, district courts must accurately "consider, among other things, 'the Guidelines' sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant.'" *United States v. Pojilenko*, 416 F.3d 243, 246 (3d Cir. 2005) (quoting *United States v. Booker*, 543 U.S. 220, 259 (2005)).

offense." U.S.S.G. § 1B1.3(a)(1).

In order to determine the scope of "relevant conduct" under the Guidelines, we must first define Abrogar's "offense of conviction." As Abrogar correctly points out, Congress did not make every violation of MARPOL by every person a crime under U.S. law. The APPS, the federal law implementing MARPOL, restricts applicability of the substantive provision violated by Abrogar. 33 U.S.C. § 1902, entitled "Ships subject to preventive measures," states as follows:

> (a) Included vessels
>
> This chapter shall apply –
>
> (1) to a ship of United States registry or nationality, or one operated under the authority of the United States, *wherever located*;
>
> (2) with respect to Annexes I and II of the Convention, to a ship, other than a ship referred to in paragraph (1), *while in the navigable waters of the United States*;
>
> (3) with respect to the requirements of Annex V of the Convention, to a ship, other than a ship referred to in paragraph (1), *while in the navigable waters or the exclusive economic zone of the United States*; and
>
> (4) with respect to the regulations prescribed in section 1905 of this title, *any port or terminal in the United States*.

33 U.S.C. § 1902(a) (emphasis added). In sum, Congress made § 1908(a)'s criminalization of MARPOL violations applicable only to U.S. ships, wherever located, and foreign ships in three specific

circumstances: (1) "while" the ship is within "the navigable waters of the United States"; (2) "while" in the "exclusive economic zone of the United States"; and (3) when at a port or terminal in the United States.

Pursuant to the plain text of the APPS, the Coast Guard regulations giving rise to Abrogar's violation contain restrictions on their applicability that are substantially identical to those set forth in the APPS. The substantive regulation that requires the proper maintenance of an oil record book is 33 C.F.R. § 151.25. 33 C.F.R. § 151.09, however, is entitled "Applicability," and it provides:

> §§ 151.09 through 151.25 apply to each ship that – [is operated "under the authority of the United States" in four specific circumstances], "or (5) Is operated under the authority of a country other than the United States *while in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States*.

*Id.* (emphasis added).

We conclude, therefore, that under the APPS and accompanying regulations, Congress and the Coast Guard created criminal liability for foreign vessels and personnel only for those substantive violations of MARPOL that occur in U.S. ports or waters. Stated differently, a MARPOL violation by such a vessel or its personnel is only an "offense" under U.S. law if that violation occurs within the boundaries of U.S. waters or within a U.S. port. As such, the precise nature of Abrogar's "offense of conviction" under the Guidelines is most accurately described as "failure to maintain an accurate oil record book *while in the navigable waters of the United States*."

By contrast, the Government's argument in favor of the enhancement assumes that the "offense of conviction" of which Abrogar is guilty – failure to maintain an accurate oil record book – occurred for "offense-defining" purposes not only within U.S. waters, but during the whole of Abrogar's tenure on the Magellan – or at least from the moment at which he entered the first false entry in the oil record book. At oral argument, however, the Government conceded that to conceive of Abrogar's offense of

conviction in those terms would require a "broad" reading of the APPS and relevant Coast Guard regulations. Indeed, we believe that the reading of the relevant provisions urged by the Government is so broad as to contravene the very meaning of those provisions. As discussed above, the United States has no jurisdiction to prosecute a foreign vessel or its personnel for "failure to maintain an accurate oil record book" outside of U.S. waters. Furthermore, no provision of the APPS or its accompanying regulations indicates that "failure to maintain an accurate oil record book" by a foreign ship outside U.S. waters is a crime.[3] Stated differently, the terms of the Act and its regulations *exclude* from criminal liability the "failure to maintain an accurate oil record book" by foreign vessels outside U.S. waters.

Assuming that the proper scope of Abrogar's offense of conviction is the knowing "failure to maintain an accurate oil record book within U.S. waters," the Government's assertion that "[u]nder the Sentencing Guidelines, th[e] [improper] discharges are relevant conduct for purposes of determining the total offense level" is incorrect. The Government acknowledged at oral argument – and the paper record before us indicates – that none of the improper discharges at issue occurred within U.S. waters. As such, none of the illegal discharges "occurred during the commission of the offense of conviction." § 1B1.3. Nor can it reasonably be asserted that the discharges took place "in preparation for that offense." *Id.* Nor did the discharges take place "in the course of attempting to avoid detection or responsibility for" maintaining a false oil record book within U.S. waters. *Id.* In fact, the reverse is true. The "offense of conviction" – maintaining a false oil record book – occurred in the course of attempting to avoid detection of the illegal discharges. In short, the improper discharges simply do not fit within the textual parameters of §

---

[3]We find this latter point particularly significant analytically. The APPS provisions and regulations cited above do not merely implicate jurisdiction. They are worded in such a way as to define, for purposes of U.S. law, the scope within which MARPOL violations constitute crimes at all, irrespective of implications for jurisdiction proper. As such, the provisions and regulations speak substantively to what can be called an "offense" under the Guidelines.

1B1.3's definition of "relevant conduct" *vis-a-vis* the "offense of conviction" as properly defined.

If the discharges are not relevant conduct, then the Government's argument collapses. The Government summarizes its textual argument by asserting that because the improper discharges "are relevant conduct, they are considered part of the 'offense' as that term is used in the Guidelines, and therefore the 'offense' resulted in the repeated discharge of oily bilge wastes and oily sludges into the ocean." We conclude that the converse of the Government's position is true: because the improper discharges are not relevant conduct, they cannot be considered part of the "offense" under the Guidelines, and therefore the "offense" did not "result[] in" repeated discharges, as is required before the six-level enhancement under § 2Q1.3 may be applied. Accordingly, we reject the Government's argument that the text of the APPS and the Guidelines supports the sentencing enhancement applied by the District Court in this case.

## B.

Perhaps sensing the weakness of its textual argument under the Guidelines, the Government also raises a policy argument in favor of the sentencing enhancement. It argues that the structure of § 2Q1.3 reflects a general policy of enhancing sentencing for recordkeeping offenses to account for damage wrought by any underlying substantive offense. The Government relies on § 2Q1.3(b)(5), which provides that "[i]f a recordkeeping offense reflected an effort to conceal a substantive environmental offense, use the offense level for the substantive offense." *Id.*

We find this argument unavailing for at least two reasons. First, because criminal liability for MARPOL violations by a foreign vessel does not attach until that vessel enters U.S. waters, the improper discharges at issue here – all of which occurred outside U.S. waters on this record – do not constitute "substantive environmental offense[s]" under U.S. law any more than the failure to maintain an accurate oil record book outside U.S. waters constitutes a recordkeeping offense under U.S. law. Thus, the policy contemplated by § 2Q1.3(b)(5) – seeking to punish substantive environmental offenses under U.S. law – would not be frustrated by vacating the enhancement as applied in this case.

10

Second, even if we were to accept the Government's policy argument as to § 2Q1.3 considered in isolation, any policy concerns implicit in § 2Q1.3(b)(5) must yield to the plain meaning of the other Guidelines and statutory provisions at issue in this case. As discussed above, the Government's assertion that the improper discharges constitute "relevant conduct" fails under the plain meaning of § 1B1.3. In addition to the general rule that plain text trumps implicit policy concerns as a matter of statutory construction, we must consider the fact that § 1B1.3 applies to all of the individual substantive provisions of the Guidelines and reflects the broader will of Congress as to a fundamental aspect of sentencing policy – the scope and type of collateral conduct to be included in sentencing. Furthermore, any policy concern implied by the Guidelines must be subordinated to the scope of liability and applicability explicitly set forth by Congress as part of the substantive statute at issue. Here, criminal liability under 33 U.S.C. § 1908(a) is plainly limited by § 1902 and the regulations accompanying the APPS. The Government's policy argument is thus unavailing.

III.

In sum, we conclude that Abrogar's "offense of conviction" – taking into account the text of the relevant provisions of the APPS and accompanying regulations – was the "failure to maintain an accurate oil record book while in U.S. waters or in a U.S. port." Under that definition of the "offense of conviction," the improper discharges are not "relevant conduct," they cannot be considered part of the "offense" under the Guidelines, and therefore the "offense" did not "result[] in" repeated discharges of a pollutant. As such, the District Court erred in applying the six-level sentencing enhancement.

For the foregoing reasons, we will vacate Abrogar's sentence and remand the case to the District Court for resentencing.