**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-2040
_____

UNITED STATES OF AMERICA

v.

NIKOLAOS VASTARDIS,

Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(No. 1-19-cr-00066-001)
District Judge: Honorable Richard G. Andrews

_____

Argued on May 27, 2021
_____


Before: McKEE, RESTREPO, FUENTES, *Circuit Judges*.

(Opinion Filed: December 7, 2021)

Edward S. MacColl [Argued]
Marshall J. Tinkle
Thompson, MacColl & Bass LLC, P.A.
15 Monument Square
Portland, ME 04101

Bruce M. Merrill
Law Offices of Bruce Merrill, P.A.
225 Commercial St.
Suite 501
Portland, ME 04101

*Counsel for Appellant*

Varu Chilakamarri [Argued]
Amelia G. Yowell
Eric Grant
Jonathan D. Brightbill
Jennifer Scheller Neumann
Thekla Hansen-Young
Richard A. Udell
Environmental Natural Resources Division
U.S. Department of Justice
P.O. Box 7415
Washington, D.C. 20044

*Counsel for Appellee*

―――――――――――

OPINION OF THE COURT
―――――――――――

FUENTES, *Circuit Judge*.

This case requires us to determine whether the United States lacks prosecutorial authority over the presentation of falsified records to U.S. officials and other related deception that occurred while a defendant was docked in the Delaware Bay port because the crimes sought to be covered up were committed on the high seas. We hold that, although Vastardis cannot be convicted in a U.S. Court for crimes occurring in international waters, the convictions here were based on the presence of inaccurate records in U.S. waters. Accordingly, the District Court had subject matter jurisdiction even though the actual entries may have been made beyond the jurisdiction of the United States while on the high seas.

Nikolaos Vastardis, a citizen and resident of the Republic of Greece, appeals his conviction and sentence for crimes that allegedly took place while he was Chief Engineer onboard a Liberian-registered petroleum tanker named the *Evridiki*. Vastardis was convicted of four offenses related to maritime pollution: failing to maintain an accurate Oil Record Book from December 8, 2018 to March 11, 2019 in violation of 33 U.S.C. § 1908(a) (Count 1); falsifying high-seas Oil Record Book entries in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1519 (Count 2); obstructing justice in the Coast Guard's investigation of the *Evridiki* in violation of 18 U.S.C. § 1505 (Count 3); and making false statements in violation of 18 U.S.C. § 1001 (Count 4). The District Court imposed a

3

$7,500 fine, a $400 special assessment, and three years' probation. As a condition of probation, Vastardis was barred from entering the United States or applying for any visas to enter the United States.

For the following reasons, we will affirm the convictions. However, we will vacate the portion of the District Court's sentence that precludes Vastardis from entering the United States while under court supervision.

## I.    INTERNATIONAL TREATIES ON MARITIME POLLUTION

The United States is a signatory to the 1973 International Convention for the Prevention of Pollution from Ships[1] and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships.[2] Both treaties relate to pollution on the high seas. Together, these treaties are referred to as "MARPOL" (short for "Maritime Pollution"), and their collective aim is to "achieve the complete elimination of international pollution of the marine environment by oil and other harmful substances."[3]

MARPOL is enforced by U.S. federal statute through the Act to Prevent Pollution from Ships ("Act to Prevent Pollution"), which criminalizes violations of MARPOL. The Act to Prevent Pollution designates the country in which a ship is registered as the "flag state," and the country receiving the

---

[1] Nov. 2, 1973, 1340 U.N.T.S. 184.
[2] Feb. 17, 1978, 1340 U.N.T.S. 61.
[3] 1340 U.N.T.S. at 128.

4

ship as the "port state."[4]   Under MARPOL and the Act to Prevent Pollution, a ship's flag state may prosecute a violation "wherever the violation occurs."[5]  By contrast, port states have jurisdiction over foreign ships only for conduct that occurs in their ports or waters and may only refer evidence of a foreign ship's high-seas misconduct to the flag state.[6]  The Act to Prevent Pollution also authorizes the Coast Guard, an agency of the United States Department of Homeland Security, to "prescribe any necessary or desired regulations to carry out the provisions of . . . MARPOL."[7]

## II.    FACTUAL BACKGROUND

During ordinary operation, oceangoing petroleum tankers accumulate large volumes of oily wastewater in their bottoms ("bilges"), engine rooms, and mechanical spaces, which can potentially pollute the ocean.    Regulations promulgated pursuant to the Act to Prevent Pollution accordingly prohibit tank vessels of 150 gross tons or more from discharging oily bilge water into the sea, unless (1) the discharge contains less than 15 parts per million ("ppm") of oil; and (2) the vessel has in operation certain pollution control equipment, including an Oily Water Separator that both filters waste and has an Oil Content Meter for monitoring waste levels in the discharge.[8]    The Oil Content Meter is part of the Oily Water Separator and it monitors samples of wastewater about to be discharged.  It is designed to sound an alarm and

---

[4] *United States v. Abrogar*, 459 F.3d 430, 432 (3d Cir. 2006).
[5] MARPOL Art. 4(1)–(2), 1340 U.N.T.S. at 185.
[6] *Id.* Art. 6(2), 1340 U.N.T.S. at 187; *Abrogar*, 459 F.3d at 432.
[7] 33 U.S.C. §§ 1903(c)(2), 1907.
[8] 33 C.F.R. § 151.10; MARPOL Annex I, Reg. 15.

5

automatically stop a discharge if the discharge contains more than 15 ppm of oil. Any bilge water that exceeds that pollution level must be retained by the vessel and taken to a "reception facility."[9]

To track a ship's pollution, MARPOL and applicable regulations require tank vessels to "maintain an Oil Record Book."[10] The Oil Record Book is a running log that includes detailed entries for every onboard oil transfer operation. Regulations require the Oil Record Book to include entries for each tank-to-tank transfer of oil; each discharge of oily bilge water; each failure of oil filtering equipment; and any accidental or emergency discharge of oily waste exceeding the legal limit.[11] Regulations also require that individual line-by-line entries in the Oil Record Book be made without delay "on each occasion" that an oil operation occurs.[12] These entries must be signed by the person in charge of that operation, such as the supervising engineer, who is responsible for "maintenance" of the Oil Record Book.[13]

Nikolaos Vastardis was the Chief Engineer responsible for maintaining the Oil Record Book while onboard the *Evridiki*, a Liberian-registered 84,796-gross ton petroleum tanker. On March 11, 2019, the Coast Guard inspected the *Evridiki* after it entered the Delaware Bay port. They soon

---

[9] 33 C.F.R. § 151.10; MARPOL Annex I, Reg. 14.
[10] 33 C.F.R. § 151.25(a).
[11] 33 C.F.R. § 151.25; MARPOL Annex I, Reg. 17.
[12] 33 C.F.R. § 151.25(h).
[13] 33 C.F.R. § 151.25(j).

became suspicious of the ship's Oil Content Meter.[14]  After docking and inspecting the ship's international oil pollution prevention certificate, Coast Guard Officer Aaron Studie asked Vastardis to run the vessel's Oily Water Separator as he would at sea, to confirm its operability.   The crew turned on the Oily Water Separator, and the Oil Content Meter displayed a reading of 0 ppm of oil.  Vastardis responded by giving Studie "two thumbs up."[15]  Studie was skeptical.  He noticed that the valve supplying the discharge to the Oil Content Meter was closed, preventing the Oil Content Meter from testing the actual sample discharge.  When that valve was opened, the

---

[14] Vastardis Br. at 7–10.   Vastardis argues that the United States had no right to investigate the *Evridiki* because a valid international oil pollution prevention certificate was presented and no clear ground for further investigation was identified at the time of inspection, citing 33 U.S.C. § 1904(d) (investigation "*is limited to verifying whether or not a valid certificate is onboard*, *unless clear grounds exist*, which reasonably indicate that the condition of the ship or its equipment does not substantially agree with the particulars of the certificate.").   However, in addition to its authority to confirm that a "valid [international oil pollution prevention] Certificate is on board," the Coast Guard also has the authority to confirm that the "condition of the ship and its equipment corresponds substantially with the particulars of the [international oil pollution prevention] Certificate" to determine whether the ship has discharged oil in violation of MARPOL, and to examine "the Oil Record Book, the oil content meter continuous records, and [conduct] a general examination of the ship."  33 C.F.R. § 151.23.  Accordingly, federal statute authorized the Coast Guard's investigation.
[15] Presentence Investigation Report ("PSR") ¶ 34.

reading remained at 0 ppm. This surprised Studie because in his experience, a flat 0–2 ppm reading indicated that the Oil Content Meter was testing a sample of freshwater. If the Oil Content Meter were testing filtered oily bilge water, one would expect to see a fluctuating reading of 3–10 ppm. As Officer Studie tried to understand the anomaly, he physically traced the sample line until it reached behind the Oily Water Separator. There, he discovered a hidden valve that was also closed, blocking the Oily Water Separator sample from flowing through the Oil Content Meter. Once this valve was opened, the Oil Content Meter immediately jumped to a reading of 40 ppm or higher. This triggered an audible alarm and caused the Oily Water Separator to go into recirculation mode.

After discovering the ship's hidden valve, Officer Studie reviewed the Oil Content Meter's memory chip to decipher the ship's past actions. He observed that the memory chip read a flat 0–2 ppm throughout the duration of all the recent discharges. Vastardis had recorded those discharges in the Oil Record Book as properly running through 15 ppm equipment. Officer Studie then realized that, given the configuration of the *Evridiki*'s Oily Water Separator, if the sample line were closed, the Oil Content Meter could be made to sample freshwater trapped in the device instead of the oily bilge water being discharged overboard. This explained why the Oil Content Meter displayed a reading of 0–2 ppm during the inspection, as well as the history recorded on the memory chip. Those recent discharges could not have been made through the 15 ppm Oil Content Meter equipment. Officer Studie suspected that during high seas operations, Vastardis "was keeping the valve closed and preventing the [Oily Water Separator's] oil content meter [from] getting an adequate

8

sample."[16] When the other Coast Guard officer conducting the inspection asked Vastardis what the position of the sample line valve was during normal operations, Vastardis repeatedly asserted that he always ran the Oily Water Separator with the valve in the "open" position.[17]

Between March 11–13, 2019, Coast Guard officers seized all of the ship's Oil Record Books for investigation. They duplicated all onboard computers and analyzed the Oil Content Meter's memory chip in greater depth. The analysis revealed that since 2018, the ship's Oily Water Separator operated 16 times, for a total of 55.5 hours, including on March 8, 2019, just three days before the inspection.[18] The Oil Record Book showed that Vastardis ran at least ten of those operations, discharging more than 62,000 gallons of oily bilge water into the ocean.[19] The Government claims that Vastardis falsified the ship's required Oil Record Book in order to indicate that the ship's oily waste discharges had been properly filtered and monitored through required pollution control equipment when the waste had actually bypassed the equipment on its way overboard.[20]

After the expanded inspection, the Coast Guard brought an *in rem* proceeding against the vessel under 33 U.S.C. § 1908(d) and (e). The Coast Guard sought criminal fines for

---

[16] Vastardis Br. at 11 (citing Motion Tr. at 42:23; omitted from App-II).

[17] Supp. App'x. at 14-15.

[18] PSR ¶ 38.

[19] Gov't's Sent'g Memorandum and Opposition to Defendant's Motion for Variance, ECF 166 at 4; Supp. App. at 84.

[20] Gov't Br. at 1.

any violation of the Act to Prevent Pollution and claimed that the Government was entitled to a bond or other surety, including human surety, under § 1908(e).[21] The ship and her entire crew were detained while the Coast Guard negotiated an Agreement on Security, insisting that the crewmembers "remain within the jurisdiction of the U.S. District Court – District of Delaware," and attend "meetings with . . . [U.S.] law enforcement personnel" until a Government lawyer "advises that their presence is no longer necessary."[22] After being held for the better part of a month without process, Vastardis and his thirty-two fellow foreign crewmembers petitioned for habeas relief in April 2019.[23] Ten days later, the Government filed a criminal complaint against Vastardis and secured *ex parte* material witness arrest warrants for the other ten crewmembers pledged as human surety.[24] Over the Government's objection, these witnesses were eventually allowed to give depositions and return to their homes overseas, subject to their agreement to return for trial unless at sea.

Vastardis was later charged in a four-count indictment with violations of the Act to Prevent Pollution and its regulations and for obstruction in connection with the Coast Guard inspection: (1) knowingly causing the failure to maintain an accurate Oil Record Book, aiding and abetting, in

---

[21] 33 U.S.C. § 1908 (d) and (e) provide criminal and civil penalties for certain persons who violate the MARPOL Protocol and allow the violating vessel to be seized and held "upon the filing of a bond or other surety satisfactory to the Secretary [of the Treasury]."

[22] App-II at 8–9.

[23] App-I at 8.

[24] *Id.* at 11.

violation of 33 U.S.C. § 1908(a), 33 C.F.R. § 151.25, and 18 U.S.C. § 2; (2) falsification of records, aiding and abetting, in violation of 18 U.S.C. §§ 1519 and 2; (3) obstruction of justice, in presenting false Oil Record Book entries and deceiving inspectors, aiding and abetting, in violation of 18 U.S.C. §§ 1505 and 2; and (4) false statements in connection with a federal investigation, aiding and abetting, in violation of 18 U.S.C. §§ 1001 and 2.

Vastardis moved to dismiss the indictment and to suppress evidence obtained during the inspection, but the District Court denied both motions. After a seven-day trial, a jury convicted him on all counts. Vastardis moved for judgment of acquittal based on sufficiency of the evidence, which the District Court denied. At sentencing, the District Court imposed a $7,500 fine, a $400 special assessment, and three years' probation, a condition of which was banishment from the United States and U.S. waters. This appeal followed.

## III.    JURISDICTION AND STANDARD OF REVIEW

The District Court had subject-matter jurisdiction over Vastardis's prosecution for federal crimes under 18 U.S.C. § 3231. We have appellate jurisdiction over the District Court's final judgment under 28 U.S.C. § 1291. We also have jurisdiction in sentencing appeals under 18 U.S.C. § 3742(a).

The parties raise several issues on appeal, each of which warrants a different level of review. We review the Government's various statutory and legal arguments on the application of the Act to Prevent Pollution *de novo*.[25]

---

[25] *United States v. Stock*, 728 F.3d 287, 291 (3d Cir. 2013).

Regarding the sufficiency of the evidence at trial, we afford "deference to a jury's findings" and draw "all reasonable inferences in favor of the jury verdict."[26] With regard to the confiscation of *Evridiki*'s Oil Record Book, we review the denial of Vastardis's motion to suppress for clear error as to the underlying factual findings and exercise plenary review over the District Court's application of the law to those facts.[27] Finally, we review Vastardis's challenge to the substantive reasonableness of his sentence under an abuse-of-discretion standard.[28]

## IV. MOTION TO SUPPRESS

As an initial matter, Vastardis argues that the District Court erred in denying his motion to suppress the Oil Record Book entries because they were unlawfully obtained by the U.S. Government.[29] In denying Vastardis's motion, the District Court concluded that "[b]inding Third Circuit precedent holds that the Coast Guard can conduct a warrantless search of a vessel given reasonable suspicion of criminal activity."[30] We analyze Vastardis's argument in three steps: (1) "we ask whether a Fourth Amendment event, such as a search or seizure, has occurred"; (2) "we consider whether

---

[26] *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010) (internal citations omitted).

[27] *United States v. Burnett*, 773 F.3d 122, 130 (3d Cir. 2014).

[28] *See United States v. Richards*, 674 F.3d 215, 220 (3d Cir. 2012).

[29] Vastardis Br. at 51–53; s*ee also* Defs.' Joint Motion to Suppress, App-II at 112.

[30] App-I at 54 (citing *United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 217 (3d Cir. 1998)).

12

that search or seizure was reasonable; and (3) if it was not, we then determine whether the circumstances warrant suppression of the evidence."[31]  We conclude that, even assuming  there was a seizure, it was reasonable.  And even if unreasonable, the violation would not have warranted the suppression of the Oil Record Book entries.

Under 14 U.S.C. § 522(a), the Coast Guard has broad authority to inspect vessels and, in certain circumstances, to make searches and seizures, "upon the high seas and waters of which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States."  As noted by the District Court, we have held that Section 522(a) authorizes "warrantless searches of vessels in U.S. territorial waters based solely upon a reasonable suspicion of criminal activity."[32]  The Coast Guard also has specific authority to inspect vessels, including Oil Record Books, for compliance with MARPOL and the Act to Prevent Pollution, and it may expand such an inspection if "clear grounds exist which reasonably indicate that the condition of the ship or its equipment does not substantially agree with the particulars of" the ship's MARPOL certificate.[33]

---

[31] *United States v. Dupree*, 617 F.3d 724, 731 (3d Cir. 2010).

[32] *United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 214 (3d Cir. 1998) (interpreting 14 U.S.C. § 89(a), now codified at 14 U.S.C. § 522(a)); *see also United States v. Benoit*, 730 F.3d 280, 284 (3d Cir. 2013) ("[A] reasonable suspicion requirement for searches and seizures on the high seas survives Fourth Amendment scrutiny." (citation and quotation marks omitted)).

[33] 33 U.S.C. § 1904(d); *see also id.* § 1907(c)(2)(A); 33 C.F.R. § 151.23(a)(1), (c); *Abrogar*, 459 F.3d at 432.

The Coast Guard's preliminary examination of the Oil Record Book and Oily Water Separator was within its inspection authority under the Act to Prevent Pollution. When the officers realized the Oily Water Separator was not filtering oil and observed prior Oil Content Meter readings showing 0 –2 ppm, and when Vastardis appeared to conceal the fact that the Oily Water Separator was not operable, the officers had clear reason to suspect a criminal violation of the Act to Prevent Pollution. Given that reasonable suspicion, the warrantless seizure of the Oil Record Book was justified.

Vastardis argues that the Act to Prevent Pollution regulations provide that the United States, like all port states, is authorized only to *copy* foreign books—not to *seize* them. Annex I of MARPOL states:

> The competent authority of the Government of a Party to the present Convention may inspect the Oil Record Book Part I on board any ship to which this Annex applies while the ship is in its port or offshore terminals and may make a copy of any entry in that book and may require the master of the ship to certify that the copy is a true copy of such entry. Any copy so made which has been certified by the master of the ship as a true copy of an entry in the ship's Oil Record Book Part I shall be made admissible in any judicial proceedings as evidence of the facts stated in the

14

entry. The inspection of an Oil Record Book Part I and the taking of a certified copy by the competent authority under this paragraph shall be performed as expeditiously as possible without causing the ship to be unduly delayed.[34]

The Government argues that while the MARPOL Annex authorizes certified copies, it does not *preclude* the Coast Guard's statutory authority to seize Oil Record Books.[35] Meanwhile, the Act to Prevent Pollution slightly modifies the language from the MARPOL Annex:

An inspection under this section may include an examination of the Oil Record Book, the oil content meter continuous records, and a general examination of the ship. A copy of any entry in the Oil Record Book may be made and the Master of the ship may be required to certify that the copy is a true copy of such entry.[36]

Even if Vastardis were correct and only copying the Oil Record Book entries was permitted, that violation would not have required the suppression of the Oil Record Book. MARPOL allows a copy of the Oil Record Book to be made and a properly certified copy can surely be admitted as evidence in a judicial proceeding. Therefore, the Government's certified copy of the book would have put the same evidence in front of the jury.[37] Accordingly, the District

---

[34] MARPOL, Annex I, Reg. 17 ¶ 7.

[35] Gov't Br. at 45.

[36] 33 C.F.R. § 151.23(c).

[37] *See United States v. Wright*, 777 F.3d 635, 641 (3d Cir. 2015) (affirming the denial of a motion to suppress because the

15

Court did not err in allowing the Oil Record Book entries into evidence, despite the records having been obtained, rather than copied, by the Government.

## V. COUNT 1 – FAILURE TO MAINTAIN AN OIL RECORD BOOK

Count 1 of the indictment charged that "[o]n or about March 11, 2019, at the Big Stone Anchorage, Delaware Bay, Delaware," Vastardis "knowingly . . . cause[d] the failure to maintain an accurate Oil Record Book for the M/T EVRIDIKI," in violation of 33 C.F.R. § 151.25, 33 U.S.C. § 1908(a), and 18 U.S.C. § 2.[38] Sections 151.25 (d) and (j) of the Code of Federal Regulations require that: "[E]ntries shall be made in the Oil Record Book on each occasion . . . whenever any of [certain specified] machinery space operations take place . . . . The master . . . shall be responsible for the maintenance of [the Oil Record Book]."

---

Fourth Amendment violation "had no impact on the evidence that could be deployed against [the defendant] at trial" since "the agents would have collected precisely the same evidence, and [the defendant] would have been unable to stop them"); *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (explaining that under the inevitable discovery doctrine, information that would have been discovered by lawful means should not be suppressed.).

[38] App-I at 38–39. On each count, the Government charged Vastardis with aiding and abetting under 18 U.S.C. § 2.

Section 1908(a) of the United States Code states:

> A person who knowingly violates the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations issued thereunder commits a class D felony. In the discretion of the Court, an amount equal to not more than ½ of such fine may be paid to the person giving information leading to conviction.

The Oil Record Book entries in question falsely documented bilge water discharges that occurred when the *Evridiki* was on the high seas. Vastardis argues that this divests the United States of the authority to enforce the penalties prescribed under MARPOL because the Act to Prevent Pollution is limited to conduct while in the navigable waters of the United States. We disagree. Instead, we—like some of our sister circuit courts— find that the arrival of the *Evridiki* in the Delaware Bay triggered the duty under Coast Guard regulations to "maintain an Oil Record Book" while in U.S. waters,[39] which brought Vastardis's conduct within U.S. jurisdiction under the Act to Prevent Pollution.

The word "maintain" in this context requires that the records be substantively accurate. Merriam-Webster's Dictionary defines "maintain" as, *inter alia*, "to keep in a state of repair, efficiency, or validity."[40] The recordkeeping

---

[39] 33 C.F.R. § 151.25(a).

[40] *Maintain*, Merriam-Webster's Unabridged Dictionary, https://www.merriam-webster.com/dictionary/maintain#:~:text=English%20Language%20Learners%20Definition%20of%20maintain%20%3A

provision would make little sense if, as Vastardis proposes, it required that ships only physically possess an Oil Record Book in any state of completeness or accuracy. Because an Oil Record Book must be accurately maintained under § 151.25, and because § 151.25 applies to foreign ships while they are in U.S. waters or in a U.S. port, the arrival in U.S. waters or a U.S. port of a ship with an inaccurate Oil Record Book constitutes a violation of that regulation. The Act to Prevent Pollution makes it a felony to violate that regulation knowingly.[41]

Two of our sister circuit courts—the Second and Fifth Circuits—have adopted this plain reading in holding that "the requirement that an oil record book be 'maintained' . . . impos[es] a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States."[42] In both cases, the United States prosecuted the defendants under § 1908(a) for knowingly maintaining Oil Record Books in a U.S. port that falsely documented high-seas discharges in violation of § 151.25.[43] In reaching this

---

%20to,etc.%20%3A%20to%20continue%20having%20or%20doing%20%28something%29.

[41] 33 U.S.C. § 1908(a).

[42] *United States v. Jho*, 534 F.3d 398, 403 (5th Cir. 2008); *see also United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 306 (2d Cir. 2009) (per curiam) ("[W]e join the Fifth Circuit in holding that [§ 151.25] imposes a duty on ships, upon entering the ports or navigable waters of the United States, to ensure that its [Oil Record Book] is accurate (or at least not knowingly inaccurate).").

[43] *Ionia*, 555 F.3d at 305; *Jho*, 534 F.3d at 402–03.

18

conclusion, the Second and Fifth Circuits rejected the argument that the obligation to "maintain" an Oil Record Book in U.S. waters imposes no substantive accuracy requirement.[44] In the recordkeeping context, "the duty to 'maintain' plainly means a duty to maintain a reasonably *complete* and *accurate* record," and "[n]o reasonable reader of [§ 151.25] could conclude, given the context, that the regulation merely imposes an obligation to preserve the [Oil Record Book] in its existing state."[45]

One of our own cases similarly supports this plain reading.[46] In *United States v. Abrogar*, we articulated this offense as the "knowing failure to maintain an accurate oil record book within U.S. waters."[47] As here, the improper discharges occurred outside U.S. waters, and Abrogar falsely documented them while he was outside U.S. waters.[48] After a Coast Guard inspection uncovered the ship's conduct, Abrogar

---

[44] *Ionia*, 555 F.3d at 307–09; *Jho*, 534 F.3d at 403.

[45] *Ionia*, 555 F.3d at 309.

[46] Because we find the text of the Act to Prevent Pollution and MARPOL to be unambiguous, Vastardis's reliance on the rule of lenity is unavailing. *See United States v. Kouevi*, 698 F.3d 126, 138 (3d Cir. 2012) ("The rule of lenity applies in those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute.") (citation omitted).

[47] 459 F.3d at 435 (internal quotation marks omitted). We did not have occasion to squarely address the Government's jurisdiction to prosecute the offense, as Abrogar pleaded guilty.

[48] *Id.* at 433, 436.

pleaded guilty to failing to maintain an accurate Oil Record Book as required by § 151.25, in violation of § 1908(a).[49] Although we vacated the District Court's imposition of a six-level sentencing enhancement for an offense that "resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment,"[50] this was because the high-seas discharges did not constitute "relevant conduct" for purposes of determining Abrogar's offense level under the U.S. Sentencing Guidelines.[51] The crime was, as here, the failure to maintain an accurate oil record book while in a U.S. port. Accordingly, Abrogar's offense did not "result[] in" any pollution, as required for the enhancement.[52]

Contrary to Vastardis's assertion, allowing the United States to prosecute this recordkeeping violation does not flout the division of authority set forth in MARPOL and the Act to Prevent Pollution. Rather, it adheres to that careful division and preserves the integrity of MARPOL. To be sure, Vastardis is correct that MARPOL vests power in flag states to prosecute high-seas misconduct "wherever the violation occurs."[53] But MARPOL still vests concurrent jurisdiction to port states over conduct in their ports or waters.[54] Because the gravamen of Vastardis's crime occurred in the Delaware Bay port, it is appropriate for U.S. prosecution under MARPOL. Port states also play a key role in *detecting* (if not prosecuting) such

---

[49] *Id.* at 433.

[50] *Id.* (quoting U.S.S.G. § 2Q1.3(b)(1)(A)).

[51] *Id.* at 437.

[52] *Id.* at 436.

[53] MARPOL Art. 4(1)–(2), 1340 U.N.T.S. at 185.

[54] *Id.* Art. 6(2), 1340 U.N.T.S. at 187; *Abrogar*, 459 F.3d at 432.

misconduct. Indeed, the ability of port states to refer violations to flag states hinges on the reliability of foreign ships' Oil Record Books, which port officers like the Coast Guard review in conducting inspections.[55] If foreign ships were free to maintain falsified Oil Record Books in U.S. ports, then "the Coast Guard's ability to conduct investigations against foreign-flagged vessels would be severely hindered," allowing those vessels "to avoid detection."[56] Ships could carry two Oil Record Books: one accurate Oil Record Book for flag-state inspection, and one falsified Oil Record Book for port-state inspection. Under such a system, port states "would be severely hampered in their ability to report violations to the flag state for enforcement, and the international system of reporting and accountability under MARPOL would collapse."[57]

The jury convicted Vastardis on Count 1 after receiving an instruction that, to do so, it must find that the offense occurred "while the . . . *Evridiki* was in the navigable waters of, or at a port or terminal of the United States."[58] Because the Government was within its jurisdiction to prosecute the ship's failure to maintain an accurate Oil Record Book in a U.S. port, we will affirm that conviction.

---

[55] *See Abrogar*, 459 F.3d at 432 ("In conducting inspections, the Coast Guard typically relies on a ship's oil record book and statements of the crew."); *Jho*, 534 F.3d at 403 ("Accurate oil record books are necessary to carry out the goals of MARPOL and the [Act to Prevent Pollution].").

[56] *Jho*, 534 F.3d at 403.

[57] *Ionia*, 555 F.3d at 308.

[58] App-II at 318–19.

## VI. COUNT 2 – FALSIFYING RECORDS, SARBANES-OXLEY

Count 2 of the indictment charged Vastardis with violating 18 U.S.C. § 1519 based on the falsified Oil Record Book. Section 1519 makes it a crime to knowingly "conceal[], cover[] up, or make[] a false entry in any record . . . with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States, . . . or in relation to or contemplation of any such matter or case."[59]

Vastardis argues that the Government failed to prove that he acted with the requisite specific intent of impeding a U.S. investigation because his falsification of the Oil Record Book would have been done with the intent to impede only a Liberian investigation, since only Liberia had jurisdiction to prosecute a recordkeeping offense. This argument fails.

The Coast Guard had statutory authority to conduct a compliance inspection and examine the ship's Oil Record Book while it was in the Delaware Bay. "While at a port or terminal under the jurisdiction of the United States, a ship is subject to inspection by the Coast Guard . . . [t]o determine whether a ship has been operating in accordance with and has not discharged any oil or oily mixtures in violation of the provisions of MARPOL."[60] Such an inspection "may include an examination of the Oil Record Book."[61] MARPOL itself

---

[59] 18 U.S.C. § 1519.
[60] 33 C.F.R. § 151.23(a); *see also* 33 U.S.C. § 1904(c)-(d); MARPOL Art 6(2), 1340 U.N.T.S. at 187.
[61] 33 C.F.R. § 151.23(c); *see also Abrogar*, 459 F.3d at 432.

authorizes a port state to "inspect the Oil Record Book on board any ship . . . while the ship is in its port or offshore terminals."[62]

Under § 1519, "[i]t is sufficient that the 'matter' [under investigation] is within the jurisdiction of a federal agency as a factual matter."[63] The Government must prove only that "(1) [the defendant] intended to impede an investigation into 'any matter' and (2) the matter at issue was ultimately proven to be within the federal government's jurisdiction."[64] The Government is "not required to prove that [the defendant] intended to obstruct or impede a specific federal investigation."[65] An Oil Record Book inspection by the Coast Guard is plainly a matter within its jurisdiction, and other circuit courts have affirmed § 1519 convictions for falsified Oil Record Books that were recorded on the high seas but presented to U.S. officials in port.[66]

---

[62] MARPOL Reg. 20(6), 1340 U.N.T.S. at 212.

[63] *United States v. Moyer*, 674 F.3d 192, 210 (3d Cir. 2012) (alterations in original) (quoting *United States v. Yielding*, 657 F.3d 688, 714 (8th Cir. 2011)).

[64] *Id.*

[65] *Id.*

[66] *See, e.g.*, *United States v. Oceanic Illsabe Ltd.*, 889 F.3d 178, 185–86 (4th Cir. 2018); *Ionia*, 555 F.3d at 310; *see also United States v. Taohim*, 817 F.3d 1215, 1222 (11th Cir. 2013) (per curiam) (affirming § 1519 conviction in a similar context, rejecting the ship captain's argument that "he could not have intended to impede . . . the Coast Guard's investigation when he allegedly ordered the omission of [a] discharge from the garbage record book because at that time, the vessel was outside the territory of the United States," since § 1519 "does

Viewing the record in the light most favorable to the Government, the evidence was sufficient to prove that Vastardis acted with the requisite intent to impede "any matter"—namely, an eventual inspection of the Oil Record Book. Vastardis was an experienced chief engineer responsible for signing Oil Record Book entries; he entered and signed the false Oil Record Book entries, he brought the Oil Record Book to the master for his signature before the ship's arrival in the Delaware Bay port, and the ship itself requested the Coast Guard inspection so that it could offload its cargo. Based on this evidence, a reasonable jury could conclude that Vastardis "knowingly falsified documents in 'contemplation of' an investigation of a 'matter,' which was proven to be within the jurisdiction of the federal government."[67] We therefore will affirm the conviction on Count 2.

---

not require that an investigation be pending or that the defendant be aware of one when he falsifies the record").

[67] *Moyer*, 674 F.3d at 211. Other courts of appeals have affirmed § 1519 convictions on similar records. *See, e.g.*, *Taohim*, 817 F.3d at 1222 (explaining that a reasonable jury could credit testimony that the defendant was an experienced "old sea dog" and was "aware that the garbage record book would be reviewed during any Port State Control Inspection" as evidence that the book was "falsified 'in contemplation of' a future Port State Control Inspection"); *Oceanic Illsabe*, 889 F.3d at 190 (citing evidence that the Oil Record Book "contained a plethora of inaccurate and false information, and . . . a vast amount of inculpatory information had not been properly recorded therein").

## VII. COUNT 3 – IMPEDING A GOVERNMENT PROCEEDING

Count 3 charges Vastardis with obstructing justice under 18 U.S.C. § 1505. Section 1505 imposes criminal liability upon anyone who:

> corruptly . . . obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency.

To convict under this section, the Government must establish: "(1) that there was an agency proceeding; (2) that the defendant was aware of that proceeding; and (3) that the defendant intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding."[68] The term "proceeding" in the context of § 1505 is construed broadly and encompasses agency investigative activities—including an agency's "search for the true facts."[69]

Count 3 charged that, during the Coast Guard's inspection of the ship's oil filtration equipment, Vastardis "ran the Oil Content Meter with the sample line closed in order to trick the system into reporting an oil content of less than 15

---

[68] *United States v. Smukler*, 991 F.3d 472, 483 n.7 (3d Cir. 2021) (quoting *United States v. Warshak*, 631 F.3d 266, 325 (6th Cir. 2010)).

[69] *See United States v. Leo*, 941 F.2d 181, 199 (3d Cir. 1991) (quoting *United States v. Browning, Inc.*, 572 F.2d 720, 724 (10th Cir. 1978)).

ppm" and, "when asked by [Coast Guard] inspectors to describe the position [of] the [Oil Content Meter] sample line valve during at-sea operations," he "falsely stated that the valve was 'open.'"[70] The Act to Prevent Pollution regulations authorize Coast Guard inspections not only "[t]o determine that a valid [international oil pollution prevention] Certificate is on board," but also "[t]o determine whether a ship has been operating in accordance with and has not discharged any oil or oily mixtures in violation of the provisions of MARPOL."[71] These regulations put ships on notice that inspections "may include an examination of the Oil Record Book, the oil content meter continuous records, and a general examination of the ship."[72] A Coast Guard inspection in a U.S. port is a "proceeding in the manner and form prescribed for conducting business before" that agency, and § 1505 reaches "all steps and stages in such an action from its inception to its conclusion."[73] Thus, contrary to Vastardis's argument, the Coast Guard's authorized investigation, even as an administrative inspection, is a "proceeding" within the meaning of § 1505.[74] We therefore will affirm Vastardis's conviction on Count 3.

---

[70] App-I at 40–41 (under seal).

[71] 33 C.F.R. § 151.23(a)(1), (a)(3).

[72] *Id.* § 151.23(c).

[73] *Leo*, 941 F.2d at 199 (quoting *Rice v. United States*, 356 F.2d 709, 712 (8th Cir. 1966)).

[74] *See United States v. Technic Services, Inc.*, 314 F.3d 1031, 1044 (9th Cir. 2002) ("An administrative investigation is a 'proceeding' within the meaning of 18 U.S.C. § 1505." (citation and quotation marks omitted)), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (en banc); *see also Taohim*, 817 F.3d at 1221 (affirming Section 1505 conviction where "the jury reasonably could have

## VIII.    COUNT 4 – FALSIFYING A MATERIAL FACT

Count 4 charged Vastardis with making false statements in violation of 18 U.S.C. § 1001. Section 1001 imposes criminal liability upon anyone who:

> knowingly and willfully--falsifies, conceals, or covers up by any trick, scheme, or device a material fact; makes any materially false, fictitious, or fraudulent statement or representation; or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Count 4 charged that, while at the Big Stone Anchorage in Delaware, Vastardis stated that when the ship's Oily Water Separator was run at sea during normal operations, the valve on the sample line to the Oil Content Meter was "open" when in fact it was closed.[75]

---

inferred that [the ship's captain] knew that the garbage record book did not include the discharge of plastic into the sea and that he made that fraudulent book available to the Coast Guard with the intent to interfere with its investigation"); *Oceanic Illsabe*, 889 F.3d at 189 & n.18, 190 & n.19 (citing evidence that ship's crew lied to Coast Guard inspectors about the functioning of the ship's equipment as supporting § 1505 convictions).

[75] App-I at 41–42.

Here again, Vastardis argues that § 1001 does not apply because the matter being investigated was not within the jurisdiction of the Coast Guard, and that his conduct was only governed by Liberian law.[76] He is wrong. As the Government correctly notes, the actions relied upon for Count 4 were made during the inspection of the *Evridiki* while Vastardis was in the Delaware Bay port and thus were subject to the Coast Guard's jurisdiction. Moreover, the crew of the *Evridiki* requested the inspection in order to receive a certification necessary to operate in the United States. Accordingly, the Coast Guard's inspection, including its inquiries about the accuracy of the Oil Record Book entries and the related operability of the ship's equipment, fell well within the Coast Guard's jurisdiction.[77]

Although Vastardis insists that the valve was open, the Government introduced evidence that it was closed.[78] Vastardis's representation that the valve was open was clearly material to the Coast Guard's inquiry, and it was false. If the sample line had been even partially open—as Vastardis had told the inspectors—the Oil Content Meter would have detected oily wastewater. Yet the reading on the Oil Content Meter was instead 0–2 ppm. At trial, the Government proved that the Oil Content Meter had in fact been sampling trapped fresh water and that Vastardis had run the Oily Water Separator with the sample line closed. Given this evidence, which we view "in the light most favorable to the Government," we find

---

[76] *See* Vastardis Br. at 2.

[77] *See United States v. Rodgers*, 466 U.S. 475, 481 (1984) (explaining that § 1001 reflects Congress's interest in protecting the integrity of official inquiries, wherever there is a statutory basis for the inquiry).

[78] App-II at 251, 257–59.

that Vastardis did violate 18 U.S.C. § 1001.[79]   The District Court therefore did not err in denying Vastardis's motion for judgment of acquittal on Count 4.[80]

## IX.   BANISHMENT

Although we find no error among Vastardis's convictions, the District Court clearly abused its discretion in applying banishment as a condition of Vastardis's probation, when it stated that he may "not enter the United States, the waters of the United States, or apply for any [v]isas to enter the United States."[81]   We have previously discussed the historical roots of banishment, summarizing it as a condition that "orders the probationer . . . to leave a broad geographic area."[82]   We have also held that a "condition of probation may not circumvent another statutory scheme."[83]   Through the Immigration and Nationality Act ("INA"), Congress outlined the sole and exclusive procedure through which foreigners may be deported from the United States.[84]

While district courts generally have broad discretion to impose conditions of probation, such discretion must be viewed against the backdrop of the INA, which provides the Attorney General with exclusive authority to admit, exclude,

---

[79] *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010) (internal quotation marks omitted).
[80] App-II at 182.
[81] App-II at 370.
[82] *United States v. Abushaar*, 761 F.2d 954, 960 (3d Cir. 1985).
[83] Id.
[84] *See id.* at 959.

and remove non-citizens.[85]  A district court abuses its discretion, circumvents the authority of the Attorney General, and oversteps the bounds of the judiciary when it imposes banishment as a condition of probation.

Furthermore, the condition that Vastardis serve his probation outside the United States is unrelated to his rehabilitation or the protection of the public.  This is another reason why a sentence that imposes banishment is an abuse of discretion.[86]  Moreover, Vastardis is a seafarer whose career depends on travel in international waters, including U.S. waters.  Because the condition of banishment impinges upon freedom of movement and has the potential to drastically interfere with the livelihood of a foreign national, it should be avoided.  We will therefore vacate that condition of Vastardis's probation.

## X.    CONCLUSION

The United States had the authority to prosecute Vastardis.  Vastardis aided the ship's presentation of a falsified Oil Record Book to U.S. officials and deceived them during an authorized inspection in an attempt to conceal the improper discharges.  Such behavior forms the basis of federal recordkeeping and obstruction offenses because it harms the United States and goes to the heart of its ability to uncover

---

[85] 8 U.S.C. § 1229a(a)(3) ("Unless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.").
[86] *Abushaar*, 761 F.2d at 961.

wrongdoing. Vastardis's light sentence—a $7,500 fine and three years' probation—reflects that his conviction reaches only his U.S.-based dishonesty and not his role in the ship's discharges of oily bilge water into the ocean while on the high seas.

With the exception of the condition of probation prohibiting Vastardis from entering the United States, we will affirm his conviction and sentence.